

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

NO. 2-08-117-CR

MARK DERICHSWEILER                                        APPELLANT

V.

THE STATE OF TEXAS                                              STATE

------------

FROM THE 362ND DISTRICT COURT OF DENTON COUNTY

------------

## OPINION

------------

### I. INTRODUCTION

The primary issue we address in this appeal is whether the trial court erred by denying Appellant Mark Derichsweiler's motion to suppress. Because, as set forth below, police lacked reasonable suspicion to stop Derichsweiler, we hold that the trial court did err by denying Derichsweiler's motion to suppress. Accordingly, we will reverse the trial court's judgment and remand this case to the trial court.

## II. FACTUAL AND PROCEDURAL BACKGROUND

A grand jury indicted Derichsweiler for driving while intoxicated. The indictment alleged two prior DWI convictions and two enhancement convictions.

Derichsweiler filed a motion to suppress all evidence arising from his initial stop, arguing that the arresting officer lacked reasonable suspicion to justify the stop. Three witnesses testified at the suppression hearing: Joe Holden, Joanna Holden, and Lewisville Police Officer Wardel Carraby.

Joe testified that at approximately 8:00 on the evening of December 31, 2006, he and Joanna ordered food from a McDonald's restaurant drive-through; Joanna was driving. While they waited for their food, Joanna said, "I don't know what's wrong with the guy in the car beside us," but Joe could not see the vehicle or the driver. The same vehicle then pulled up in front of the Holdens' car, and the vehicle's driver—Derichsweiler—stared at them, grinning, for about fifteen seconds. Derichsweiler then drove around the McDonald's building and stopped behind and to the left of the Holdens' car. Again, Derichsweiler stared and grinned at the Holdens for fifteen to twenty seconds. The Holdens became "extremely concerned"; they did not know the driver's motive, whether he "was out to get us or if there was a robbery in progress." Joe called 911. He identified himself to the operator, told the operator that

2

"there was some suspicious behavior with the vehicle," described the vehicle, and recited its license number.

Meanwhile, Derichsweiler drove to the adjacent Wal-Mart parking lot, where he appeared to be "doing the same thing with another vehicle that was parked." Joe lost track of Derichsweiler's vehicle, and then patrol cars arrived "from everywhere." Before Joe and Joanna left the scene, a police officer spoke to them; they provided the officer with their contact information. On cross-examination, Joe conceded that he did not see Derichsweiler commit any crimes or make any threatening gestures.

Joanna testified that Derichsweiler's conduct, "[j]ust kind of grinning and just being stopped beside us while we're stopped at a drive-through and looking straight at us[,] just didn't seem normal" to her. When Derichsweiler stopped behind the Holdens, Joanna became afraid and told Joe to call 911. She testified that she watched Derichsweiler drive to the Wal-Mart parking lot: "He's pulling into parking spots and staying there for about the same amount of time that he was observing us, and then pulling out and moving into different parking spots, and kind of closer to the door." Joanna also testified that she did not see Derichsweiler commit any crimes and that the only gesture she saw him make was grinning. Nonetheless, she claimed that she "felt stalked."

3

Officer Carraby, who had about one year's experience as a peace officer at the time of the incident, testified that he received a dispatch concerning a suspicious vehicle. The dispatcher gave him the vehicle's description and license number and identified Joe Holden as the person who had reported the vehicle. Officer Carraby and another officer in a different patrol car responded to the dispatch and drove to the Wal-Mart parking lot. Officer Carraby saw Derichsweiler's vehicle driving around the Wal-Mart parking lot and pulling into a parking spot in the Wal-Mart lot. Officer Carraby and the other officer pulled up behind Derichsweiler's vehicle, another officer drove up in a third patrol car, and the three vehicles "surrounded" Derichsweiler's vehicle, blocking it in. Officer Carraby testified that, at that point, Derichsweiler could not have driven away if he had wanted to and that Officer Carraby would not have let Derichsweiler leave until he could talk to Derichsweiler to find out what was going on.

Officer Carraby got out and approached Derichsweiler's vehicle. When Derichsweiler rolled down his window, Officer Carraby smelled a strong odor of alcoholic beverages coming from the vehicle, and he began to investigate the case as a DWI.

The trial court denied Derichsweiler's motion to suppress. After trial, the trial court made findings of fact and conclusions of law regarding

4

Derichsweiler's stop, concluding that Officer Carraby had reasonable suspicion to detain Derichsweiler "to investigate his suspicious behavior and possible involvement in criminal activity" and that the case was "almost on point" with *Bobo v. State*, 843 S.W.2d 572, 575 (Tex. Crim. App. 1992).

The case was tried to a jury. Both Joe and Joanna testified at trial, and their testimony was essentially identical to their testimony at the suppression hearing. Officer Carraby's testimony was also consistent with his suppression-hearing testimony, but he added that he parked his patrol car "in such a manner to block [Derichsweiler's] vehicle in." He testified that Derichsweiler was not free to leave.

The jury found Derichsweiler guilty of DWI, found the sentencing enhancement allegations to be true, and assessed punishment at forty-seven years in prison. The trial court sentenced him accordingly.

### III. REASONABLE SUSPICION FOR STOP

In his first point, Derichsweiler argues that the trial court erred by denying his motion to suppress because Officer Carraby lacked reasonable suspicion to stop him.

### A. Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex.

5

Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

6

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *Kelly*, 204 S.W.3d at 818–19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id*. at 819.

When determining whether a trial court's decision is supported by the record, we generally consider only evidence adduced at the suppression hearing because the ruling was based on it rather than evidence introduced later. *See Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007); *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App.), *cert. denied*, 519 U.S. 1043 (1996). But this general rule is inapplicable when the parties consensually relitigated the suppression issue during trial on the merits. *Gutierrez*, 221 S.W.3d at 687; *Rachal*, 917 S.W.2d at 799; *Beall v. State*, 237 S.W.3d 841, 846 (Tex. App.—Fort Worth 2007, no pet.). If the State raised the issue at trial either without objection or with subsequent participation in the inquiry by the defense, the defendant is deemed to have elected to re-open the evidence, and

7

we may consider the relevant trial testimony in our review. *Rachal*, 917 S.W.2d at 799.

### B. The Law of Detentions and *Terry* Stops[1]

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV.; *Wiede*, 214 S.W.3d at 24. To suppress evidence because of an alleged Fourth Amendment violation, the defendant bears the initial burden of producing evidence that rebuts the presumption of proper police conduct. *Amador*, 221 S.W.3d at 672. A defendant satisfies this burden by establishing that a search or seizure occurred without a warrant. *Id.* Once the defendant has made this showing, the burden of proof shifts to the State, which must then establish that the government agent conducted the search or seizure pursuant to a warrant or that the agent acted reasonably. *Id.*; *Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005); *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005).

A detention, as opposed to an arrest, may be justified on less than probable cause if a person is reasonably suspected of criminal activity based on specific, articulable facts. *Terry*, 392 U.S. at 22, 88 S. Ct. at 1880;

---

[1] We utilize the terms "stop" and "detention" or "investigative detention" jointly and interchangeably herein. *See Terry v. Ohio*, 392 U.S. 1, 10, 88 S. Ct. 1868, 1874 (1968).

*Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000). An officer conducts a lawful temporary stop or detention when he or she has reasonable suspicion to believe that an individual is violating the law. *Ford*, 158 S.W.3d at 492. Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Id.* at 492–93. This is an objective standard that disregards any subjective intent of the officer making the detention and looks solely to whether an objective basis for the detention exists. *Id.* at 492. We look at only those facts known to the officer at the inception of the detention. *State v. Griffey*, 241 S.W.3d 700, 704 (Tex. App.—Austin 2007, pet. ref'd).

"The factual basis for stopping a vehicle need not arise from the officer's personal observation, but may be supplied by information acquired from another person." *Brother v. State*, 166 S.W.3d 255, 257 (Tex. Crim. App. 2005), *cert. denied*, 546 U.S. 1150 (2006); *see Bobo*, 843 S.W.2d at 575. Reasonable suspicion may be established based on information given to police officers by citizen informants, provided the facts are adequately corroborated by the officer. *Brother*, 166 S.W.3d at 258–59. Corroboration does not mean that the officer must personally observe the conduct giving rise to reasonable

9

suspicion, but simply requires the officer to confirm enough facts to reasonably conclude that the informant's information is reliable. *Id.* at 259 n.5; *see also Alabama v. White*, 496 U.S. 325, 330–31, 110 S. Ct. 2412, 2416–17 (1990).

## C. Officer Carraby Lacked Reasonable Suspicion

Before turning to the question of whether Officer Carraby had reasonable suspicion to stop Derichsweiler, we must consider the State's argument that Derichsweiler was not "detained" when the officers surrounded his vehicle with their patrol cars, blocking him from leaving. The State argues that no stop or detention occurred until after Officer Carraby approached Derichsweiler's vehicle and detected the odor of alcoholic beverages emanating from the vehicle. The State cites *State v. Garcia-Cantu*, 253 S.W.3d 236, 244–49 (Tex. Crim. App. 2008), and that case's list of factors that help determine whether a stop occurred. One of the *Garcia-Cantu* factors is whether the police officer "boxed in" the suspect's vehicle. *Id*. at 246. The State concedes that Officer Carraby parked his patrol car in a way that blocked Derichsweiler's vehicle, but it argues that a reasonable person would not conclude from this fact that he was being detained and that "[f]ar more likely, a reasonable and innocent person would believe something else was going on at the location." But at the suppression hearing, Officer Carraby testified that his and two other patrol cars "surrounded" Derichsweiler's vehicle and that Derichsweiler could not have left

10

if he had wanted.  And at trial, Officer Carraby testified that he blocked Derichsweiler's vehicle from leaving and that Derichsweiler, in fact, was not free to leave.[2]  Joe testified at the suppression hearing that after he lost sight of Derichsweiler's vehicle, the next thing he saw was "[p]olice cars [coming] from everywhere," and Joanna testified that she saw three patrol cars "swooping in" from all angles and parking all around Derichsweiler's vehicle such that he could not move.

When that testimony is added to the analysis, it seems impossible for a reasonable person to conclude that he was *not* being detained.  And as the *Garcia-Cantu* court noted, "boxing in" is a significant factor in determining whether a detention occurred; "[m]ost courts have held that when an officer 'boxes in' a car to prevent its voluntary departure, this conduct constitutes a Fourth Amendment seizure." *Id.* n.44 (collecting cases).  We therefore reject the State's argument that Officer Carraby did not stop or detain Derichsweiler until after the officer smelled the odor of alcoholic beverages emanating from Derichsweiler's vehicle.  We now turn to the merits of Derichsweiler's argument.

---

[2] We may consider both the suppression-hearing and trial testimony because Derichsweiler raised the suppression issue before the jury, beginning with his opening statement and continuing with his cross-examination of Officer Carraby.  *See Rachal*, 917 S.W.2d at 799.

11

A proper analysis begins by looking at only those facts known to Officer Carraby at the inception of his detention of Derichsweiler. Officer Carraby knew that a citizen informant had reported that a suspicious male in a small gray car with license plate number 971-MPM was driving or circling around the public parking lot of McDonald's and Wal-Mart at 8:00 one evening.[3] At the suppression hearing, Officer Carraby explained that when he responded to the dispatch, he did not know what specific activity gave rise to the 911 caller's suspicion. He said that other than the fact that the vehicle was circling the parking lot, he did not receive any other information that the driver was committing any "other criminal activity." Officer Carraby explained that, based on his training and experience, he believed that "there was possible criminal

---

[3] At the suppression hearing, Officer Carraby testified about the call he received from dispatch:

> I don't remember from memory, but based on the document that I'm reading, it was a suspicious subject phone call. The witness advised that they saw a small gray car. They gave the license plate number as Texas license plate number . . . 971 MPM, circling the parking lot of Wal-Mart and McDonald's. The complainant thought that the vehicle was suspicious and wanted us to check it out.

Officer Carraby's testimony during trial was consistent with his testimony at the suppression hearing regarding the dispatch call. He explained at trial that dispatch told him that "[t]here was a suspicious male driving around in a small gray car with a license plate of 971-MPM, driving around the parking lot of McDonald's and Wal-Mart."

activity afoot" because "it's not normal for vehicles to drive around the parking lot at 8:00 o'clock at night." Joe could not recall how he explained to the 911 operator what the vehicle had been doing and said that "[i]t was a pretty quick phone call."

This is the sum total of the information known to Officer Carraby—both from dispatch and from the officer's independent observations—when the officers detained Derichsweiler by "blocking in" his vehicle with three police vehicles. No evidence exists in the record that any cooperating officer knew any additional facts other than those testified to by the Holdens and Officer Carraby. *See State v. Jennings*, 958 S.W.2d 930, 933 (Tex. App.—Amarillo 1997, no pet.) (noting that a reviewing court "must proceed cautiously when it appears that the detaining officer acted upon *nothing other than* a radio dispatch"); *cf. Fearance v. State*, 771 S.W.2d 486, 509 (Tex. Crim. App. 1988), *cert. denied*, 492 U.S. 927, 109 S. Ct. 3266 (1989) (stating that trial court could rely on the sum of the information known to the cooperating officers at the time of the incident).

The trial court relied upon *Bobo v. State* in its findings of fact, concluding that the factual situation in *Bobo* is "almost on point with the case at bar." *See* 843 S.W.2d 574–75. In *Bobo*, an off-duty police officer acting as a townhome complex security guard was notified that a resident of a townhome complex

13

"had observed two suspicious persons *in an area where they should not be*."

*Id.* at 575 [emphasis added]. The court of criminal appeals held that the citizen's report of suspicious persons around several townhomes, the observation of two individuals matching the descriptions provided by the citizen, and the officer's fifteen years' experience provided the officer with reasonable, articulable suspicion that the individuals were connected with criminal activity. *Id*.

The salient difference between the facts in *Bobo* and the present facts is that in *Bobo*, the townhouse security guard—an off-duty police officer with fifteen years' law enforcement experience—was notified that a townhome resident reported "suspicious persons" in an area of the townhome complex "*where they should not be*." *See id.* [emphasis added] Consequently, in *Bobo*, the officer—while he was on duty as the townhome security guard—obtained information from a townhome resident that gave rise to reasonable, articulable suspicion that the two suspicious individuals were connected with criminal activity, i.e., criminal trespass. *See* Tex. Penal Code Ann. § 30.05 (Vernon Supp. 2009). But here, Officer Carraby—a police officer with only one year of law enforcement experience—was notified by dispatch only that a vehicle, deemed suspicious by the caller for a reason unknown to Officer Carraby, was circling two public parking lots at 8:00 p.m., an act which does not constitute

14

criminal behavior.[4] *See Griffey*, 241 S.W.3d at 705 (holding that officer lacked reasonable suspicion based on Whataburger manager's report that individual was passed out behind wheel in drive-through line, "which does not constitute criminal behavior"). The suspicious persons in *Bobo* were reported by a resident of the townhome complex to be "milling around some [of the] townhouses," and the court noted the suspicious persons were in an area "where they should not be"; the suspected criminal trespass by the suspicious persons in *Bobo* is conduct inherently more suspicious than Derichsweiler's conduct circling and parking in public parking lots at 8:00 at night. *See Bobo*, 843 S.W.2d at 573.

Thus, unlike in *Bobo*, this is not a case in which the officer received information that a citizen informant witnessed criminal behavior. *Compare Bobo*, 843 S.W.2d at 575 (townhome resident described two suspicious persons in an area where they should not be); *Brother*, 166 S.W.3d at 258 (citizen described defendant's car and location, as well as his erratic driving);

---

[4] The dissent argues that "it is unlikely" that Wal-Mart was open that night because it was 8:00 p.m. on New Year's Eve. The record demonstrates that McDonald's was open for business that night and that the Wal-Mart parking lot had several vehicles parked in it because Derichsweiler was reportedly pulling up next to other vehicles in the Wal-Mart lot. Apparently, Wal-Mart was open for business or just closing. In any event, the evidence establishes that the parking lots was public places.

*Pipkin v. State*, 114 S.W.3d 649, 654 (Tex. App.—Fort Worth 2003, no pet.) (citizen described defendant driving under speed limit and smoking a crack pipe); *State v. Stolte*, 991 S.W.2d 336, 341 (Tex. App.—Fort Worth 1999, no pet.) (unidentified citizen caller described erratic driving and identified car and location), *with Griffey*, 241 S.W.3d at 705 (citizen informant reported that individual was passed out behind wheel in drive-through line). Although the possibility of an innocent explanation for Derichsweiler's actions did not deprive Officer Carraby of the ability to reasonably suspect criminal conduct, the State bore the burden to show that the officer had reasonable suspicion that Derichsweiler was violating the law. *See Castro v. State*, 227 S.W.3d 737, 741 (Tex. Crim. App. 2007); *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997). The testimony of Officer Carraby that driving around the public parking lots of two businesses at 8:00 p.m. is not normal behavior cannot, without more, support his reasonable-suspicion determination.

Even considering as part of the totality of the circumstances the information that was not relayed to Officer Carraby before Derichsweiler's detention but that was presented at trial—that Derichsweiler drove up beside the Holdens, grinned at them for about fifteen seconds, drove around the McDonald's, stopped behind them, and grinned again for fifteen to twenty seconds—these additional facts do not cause the facts known by Officer

16

Carraby and the rational inferences from those facts to rise to the level of specific, articulable facts that Derichsweiler was connected with criminal activity. *See Ford*, 158 S.W.3d at 492–93. The Holdens testified that the only gesture Derichsweiler made toward them was a grin, that nothing Derichsweiler did could be described as criminal activity, that he made no obscene or threatening gestures, and that he was not driving erratically.

The trial court made a finding of fact that "[a]lthough no testimony was provided concerning the historic crime rate at the scene, it is within the realm of general knowledge of a police officer that parking lots are locations where break ins and thefts occur." This finding of fact is not supported by the record; Officer Carraby testified only that driving around a parking lot at 8:00 at night is not normal behavior; he did not testify as to what crime he thought Derichsweiler might be committing. Because this finding is not supported by the record it is entitled to no deference. *See, e.g.*, *Garcia v. State*, 919 S.W.2d 370, 379 (Tex. Crim. App. 1994) (refusing to defer to trial court's finding not supported by record on suppression issue). And this is not the type of fact subject to judicial notice. *See* Tex. R. Evid. 201 (providing that a judicially noticed fact must be one not subject to reasonable dispute). Finally, even taking this finding of fact as true and giving it deference, it provides no additional specific, articulable facts concerning Derichsweiler's conduct. The

17

finding is not limited in location, time, or conduct. Under this finding, reasonable suspicion exists to stop any and all vehicles circling any and all public parking lots at any and all times.

Officer Carraby could have waited until Derichsweiler exited his vehicle to approach him and initiate a consensual encounter to determine if additional information existed to corroborate the Holdens' call. But, instead, Officer Carraby and two other officers initiated an investigative detention by "blocking in" Derichsweiler's vehicle with their patrol cars, preventing Derichsweiler from leaving the parking spot where he had parked.

Because, based on the totality of the circumstances, the information that Officer Carraby received from dispatch, coupled with his law enforcement experience, independent observations, and the rational inferences from all of the information, did not rise to the level of specific and articulable facts that Derichsweiler was connected with criminal activity, we sustain Derichsweiler's first point. *See Ford*, 158 S.W.3d at 492–93.

## IV. CONCLUSION

Having sustained Derichsweiler's first point, we need not address his remaining points.  *See* Tex. R. App. P. 47.1.  We reverse the trial court's judgment and remand this case to the trial court for further proceedings consistent with this opinion.


SUE WALKER
JUSTICE

PANEL:  DAUPHINOT, GARDNER, and WALKER, JJ.

GARDNER, J. filed a dissenting opinion.

PUBLISH

DELIVERED: November 25, 2009



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

NO. 2-08-117-CR

MARK DERICHSWEILER                                                      APPELLANT

V.

THE STATE OF TEXAS                                                            STATE

------------

FROM THE 362ND DISTRICT COURT OF DENTON COUNTY

------------

## DISSENTING OPINION

------------

I respectfully dissent. The totality of the circumstances, including Officer Carraby's training and experience, the locality, the date, the time of evening, the information conveyed to him by dispatch, and his independent observations established reasonable suspicion for Appellant's detention for further investigation. It was dark at 8:00 p.m. on New Year's Eve when Joe and Joanna Holden ordered food from the McDonald's restaurant drive-through. The third time Appellant parked close to them, Joe felt intimidated and

uncomfortable. At Joanna's insistence, Joe called 911. He identified himself to the 911 operator, described the vehicle, and recited its license number. Joe did not remember exactly what else he told dispatch but "basically there was some suspicious behavior with the vehicle. And, you know, kind [sic] what they had done." Meanwhile, Appellant drove to the adjacent Wal-Mart parking lot, where Joanna observed Appellant "pulling into parking spots and staying there for about the same amount of time that he was observing us, and then pulling out and moving into different parking spots, and kind of closer to the door." Joe lost track of the vehicle, and then police cars arrived "from everywhere." Before Joe and Joanna left the scene, a police officer spoke to them, and they gave him their contact information. On cross-examination, Joe conceded that he did not see Appellant commit a crime or make threatening gestures toward Joe and Joanna but described his behavior as "intimidating."

Officer Carraby was a certified peace officer with training and about one year of experience as a Lewisville police officer at the time of the incident. He testified that he was familiar with the area where the McDonald's and Wal-Mart were located because it was his regular area of patrol. It was common, Officer Carraby said, for him to receive dispatches about suspicious vehicles or persons. He received the dispatch concerning a suspicious vehicle "circling" the Wal-Mart parking lot. The dispatcher gave him the vehicle's description and

2

license number and identified Joe Holden as the citizen who had reported the vehicle. Officer Carraby and another officer in a different patrol car responded to the dispatch and drove to the Wal-Mart parking lot. Officer Carraby located and personally observed Appellant's vehicle still driving around and parking in the Wal-Mart lot.

Officer Carraby testified that dispatch "advised that the complainant caller, Joe Holden, stated that the vehicle was circling the parking lot, and he believed it to be suspicious." Officer Carraby further testified that, based upon his training and experience and what he had been taught at the academy and in field training, it is "not normal" for vehicles to drive around parking lots at night. He identified the vehicle based on the license plate, make, and model of the car provided by the Holdens; observed the vehicle being driven around the parking lot; and detained the vehicle based upon the information dispatch gave him and his belief that "there was possible criminal activity afoot."

The trial court denied Appellant's motion to suppress. After trial, the trial court made findings of fact and conclusions of law regarding Appellant's detention, concluding that Officer Carraby "clearly had reasonable suspicion to detain the Defendant to investigate his suspicious behavior and possible involvement in criminal activity" and that the case was "almost on point" with *Bobo v. State*, 843 S.W.2d 572, 575 (Tex. Crim. App. 1992).

3

The majority opinion disagrees with the trial court's reliance upon *Bobo,* reasoning that the officer in that case received information that a citizen informant had observed "criminal behavior." The majority distinguishes *Bobo* from the case before us on the ground that the vehicle here was deemed suspicious merely because it was circling a parking lot, which is not criminal behavior. Maj. Op. at p. 15. I disagree that this is a valid distinction.

It is well-settled that reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that when combined with rational inferences that may be drawn from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Curtis v. State,* 238 S.W.3d 376, 380-81 (Tex. Crim. App. 2007) (citing *Woods v. State,* 956 S.W.2d 33, 38 (Tex. Crim. App. 1997). When a detention is based upon conduct by the suspect, that conduct need not itself be unlawful or in some sense inconsistent with innocence. *Woods*, 956 S.W.2d at 38 (paraphrasing *U.S. v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585 (1989)).

"[I]nnocent behavior will frequently provide the basis for a showing of probable cause." *Id.* at 38. Where innocent behavior is the basis for a determination of reasonable suspicion, the relevant inquiry "is not whether particular conduct is innocent or criminal, but the degree of suspicion that

4

attaches to particular types of noncriminal acts." *Id.* at 38. The reasonableness of the suspicion must be determined by the "totality of the circumstances." *Sokolow,* 490 U.S. at 8, 109 S. Ct. at 1585–86; *see Vafaiyan v. State*, 279 S.W.3d 374, 379–80 (Tex. App.—Fort Worth 2008, pet. ref'd) (holding purchases of small amounts of cold medicine containing Sudafed formed sufficient basis for reasonable suspicion in light of totality of circumstances).

Additionally, contrary to the majority opinion's characterization of *Bobo's* holding, the court of criminal appeals never said in that case that the two suspicious persons milling around the townhouses were engaged in criminal activity. The most that the opinion in *Bobo* says is that they were observed "in an area where they should not be." *Bobo*, 843 S.W.2d at 575. Moreover, the court in *Bobo* did not hold that reasonable suspicion for temporary detention was created by the report of that conduct. Instead, the court of criminal appeals looked to all of the surrounding circumstances and held that the officer's fifteen years of law enforcement experience, seeing the individuals leaving the area who matched the descriptions of the suspicious persons, as well as the report of the citizen identifying them as suspicious persons around several homes, and the observation of appellant—who matched the description in the report, provided the officer with a reasonable, articulable basis to

5

conclude that further investigation was necessary. *Id.; Kendrick v. State,* 93 S.W.3d 230, 237 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (relevant inquiry not whether conduct is criminal or civil but the degree of suspicion that attaches to particular types of noncriminal acts); *Sargent v. State*, 56 S.W.3d 720, 724 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) (multiple calls from pay phone, innocent standing alone, justified detention where coupled with visits to trailer known for heroin sales and failure to identify ); *Jackson v. State*, No. 05-99-00361-CR, 2001 WL 8867, at *3 (Tex. App.—Dallas 2001, no pet.) (gesture as if to hide something in defendant's pants, although seemingly innocent, sufficient to justify detention coupled with initial attempt to leave scene and experience of officer, citing *Bobo*, 843 S.W.2d at 575).

A citizen's suspicious person report can be enough to support an officer's reasonable suspicion for a detention, provided the facts are adequately corroborated by the officer.[1] *Brother v. State,* 166 S.W.3d 255, 258–59 (Tex.

---

[1] There is no issue here as to anonymity of the tipster as in *State v. Jennings*, 958 S.W.2d 930, 933–34 (Tex. App.—Amarillo 1997, no pet.), cited by the majority. Nor is there any question whether the facts were adequately corroborated. The caller relayed to the dispatcher the suspicious vehicle's movements in the parking lot, provided the make, model, and license number of the vehicle, and made himself accountable by providing his identity and contact information and remaining at the scene until the officers arrived. *See Brother*, 166 S.W.3d at 259; *Pipkin v. State*, 114 S.W.3d 649, 654 (Tex. App.—Fort Worth 2003, no pet.).

Crim. App. 2005). Information from a citizen who has actually witnessed a criminal event is considered inherently reliable and will support a temporary detention if sufficiently corroborated. *Hime v. State*, 998 S.W.2d 893, 895 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd). The informant's willingness to be held accountable further enhances his reliability. *Id; Reesing v. State,* 140 S.W.3d 732, 736 (Tex. App.—Austin 2004, pet. ref'd). But citizen-informant tips of behavior that is merely suspicious and consistent with criminal activity may also be used to establish reasonable suspicion for a temporary detention. *Bobo,* 843 S.W.2d at 575 (report by citizen sufficient that identified suspicious persons around several homes where they should not be, leaving in an automobile, and officer's fifteen years' experience); *State v. Fudge,* 42 S.W.3d 226, 230 (Tex. App.—Austin 2001, pet. ref'd) (upholding stop based on face-to-face report pointing out driver of vehicle and stating that he "could not stay on the road"); *see also Soto v. State,* No. 09-07-00336-CR, 2008 WL 4936844, at *2 (Tex. App.—Beaumont Nov. 12, 2008, no pet.) (mem. op., not designated for publication) (911 call reporting unidentified vehicle parked in driveway, although caller did not know what driver was doing, what he intended, or what he had done, reasonably supported investigative stop); *Santa Cruz v. State*, No. 04-01-00762-CR, 2002 WL 31465799, at *1–2 (Tex. App.—San Antonio Nov. 6, 2002, no pet.) (not designated for publication)

7

(holding officer had reasonable suspicion to stop defendant based on call about a "suspicious vehicle" matching defendant's vehicle and statement from unknown woman who appeared frightened, that "the car he was looking for was behind him").

The majority cites *State v. Griffey*, 241 S.W.3d 700, 704 (Tex. App.—Austin 2007, pet. ref'd), as holding that an officer lacked reasonable suspicion based upon a restaurant manager's report that a woman was passed out behind the wheel in the drive-through line, "which does not constitute criminal behavior." Maj. Op. at p.14–15 (quoting from *Griffey,* 241 S.W.3d at 705). However, that the conduct described in the report was not criminal was not the basis for the court's holding that the officer lacked reasonable suspicion. Instead, the Austin court of appeals concluded that the report, standing alone, was insufficient to establish reasonable suspicion because there was no corroboration of it and, instead, the responding officer found the woman awake, directly contradicting the information in the report.[2] *Griffey*,

---

[2] The court in *Griffey* cited *Cornejo v. State*, 917 S.W.2d 480 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd) as an example of the most reliable form of citizen-informant tip, information given by victims of a drive-by shooting that gang members had fired at them. *Griffey*, 241 S.W.3d at 704–05. But the information in *Cornejo* was not given as a citizen-informant tip; rather, it was given as statements by the victims after the police arrived on the scene; and the issue was not reasonable suspicion to detain the alleged driver-shooter but probable cause for a warrantless arrest. *Cornejo,* 917 S.W.2d at 483.

8

241 S.W.3d at 704. Unlike the report in *Griffey*, the information provided by the dispatcher here was consistent with, corroborated, and confirmed by what Officer Carraby observed upon his arrival at the scene—Appellant was still driving around the Wal-Mart parking lot and the license plate, make, and model of the vehicle matched the description given by Joe Holden.

I agree with the trial court that *Bobo* is on point, and that case supports the trial court's reasonable suspicion determination in this case. Joe Holden's 911 call about Appellant's "suspicious" behavior in driving or circling around the parking lot is like the "suspicious persons" call in *Bobo* about the individuals milling around the townhouses.[3] *See Bobo*, 843 S.W.2d at 573. As in *Bobo*, Officer Carraby was able to identify Appellant's vehicle based on the information provided by the citizen-informant. *See id*. In addition, upon his arrival at the scene, Officer Carraby independently observed the exact behavior by Appellant that had been reported by Holden, circling the Wal-Mart parking lot, which in Officer Carraby's experience was not normal. And this behavior was occurring around 8:00 p.m., after dark on New Year's Eve, a night when

---

Neither *Griffey* nor *Cornejo* stands for the proposition that citizen-informant tips will only support reasonable suspicion for detention if the conduct they report is criminal activity.

[3] There is no evidence in the record that the Wal-Mart and adjacent Sam's Club were open for business at 8:00 p.m. on that New Year's eve.

it is unlikely that the stores remained open for business but not unlikely that a driver might have consumed an excessive amount of alcohol. The only salient difference between the detention in *Bobo* and the one in this case is that the detaining officer in *Bobo* had fifteen years' experience—a factor cited by the court of criminal appeals—and Officer Carraby had just one year of experience. *See id*. at 575. I cannot see how the difference in the officers' experience compels a different outcome, particularly in light of the fact that this Wal-Mart parking lot was part of Officer Carraby's regular patrol, and the officer in each case testified that his law-enforcement experience played a role in forming his suspicion that crime was afoot.

Viewing the evidence in the light most favorable to the trial court's ruling, I would hold that, examining the totality of the circumstances, Officer Carraby had specific articulable facts, which taken together with the rational inferences that could be drawn from those facts, provided reasonable suspicion that Appellant was, had been, or soon would be, engaged in criminal activity, to-wit: driving while under the influence of alcohol. I would hold that the trial court did not err by concluding that Officer Carraby had reasonable suspicion to justify Appellant's detention and by overruling the motion to suppress, and would proceed to consider Appellant's remaining points. Because the majority holds otherwise, I dissent.

ANNE GARDNER
JUSTICE

PUBLISH

DELIVERED: November 25, 2009