

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0176-10

**MARK DERICHSWEILER, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE SECOND COURT OF APPEALS
### DENTON COUNTY

PRICE, J., delivered the opinion of the Court in which WOMACK, KEASLER, HERVEY and COCHRAN, JJ., joined. KELLER, P.J., filed a concurring opinion. MEYERS, J., filed a dissenting opinion. JOHNSON, J., dissented.

## O P I N I O N

Over a dissent, a panel of the Fort Worth Court of Appeals in this case held that reasonable suspicion was lacking to believe that the appellant was about to commit a crime when the police detained him for investigative purposes.[1] The court of appeals held that the appellant's behavior, while admittedly odd, did not provide a specific, articulable basis to

---

[1] *Derichsweiler v. State*, 301 S.W.3d 803 (Tex. App.—Fort Worth 2009).

believe that he was engaged in or contemplating criminal activity. We granted the State's petition for discretionary review to address whether the court of appeals erred to require some indication of a specific criminal offense as a necessary component of reasonable suspicion. We will reverse the judgment of the court of appeals.

## FACTS AND PROCEDURAL POSTURE

### In the Trial Court

The appellant was indicted for felony driving while intoxicated. At the punishment phase of trial, the jury found that he had twice before been convicted of a felony and assessed his punishment at forty-seven years in the penitentiary. Prior to trial, the appellant filed a motion to suppress evidence obtained as a product of his arrest, which occurred in the parking lot of a Wal-Mart in Lewisville. He claimed that the police lacked reasonable suspicion initially to detain him, which rendered any product of his subsequent arrest for DWI inadmissible. The parties adduced evidence relevant to the legality of the detention during both a pre-trial hearing on the appellant's motion to suppress and the guilt phase of the appellant's trial. Combined, that evidence showed the following.

At approximately 8:00 p.m., after dark on New Years Eve, December 31, 2006, Joe Holden and his wife, Joanna, were in the drive-thru lane at McDonald's. Joanna, who was behind the wheel, noticed that a man she did not know had pulled up beside them in a car. She described this man as "[j]ust kind of grinning and just being stopped beside us . . . and looking straight at us[, which] just didn't seem normal to me." The man lingered for between

thirty seconds to a minute before driving on.  Having placed their order, the Holdens were

asked to pull out of the drive-thru lane while their food was being prepared.  When they did

so, both Joe and Joanna noticed that the same stranger had positioned his car to the front of

theirs and was again grinning and staring at them.  This seemed to last for fifteen to twenty

seconds, after which the man circled the restaurant and then pulled up behind, and to the left

side of, the Holdens' car, "not quite blocking [them] in." He renewed his grinning and stared

at them for about the same duration, maybe a little longer.[2]  The Holdens felt "threatened"

and "intimidated" by the man's peculiar conduct.  They suspected that there might be a

robbery in progress or that they were themselves being sized up or "stalked."[3]  Joanna

insisted that Joe call 911 and report the encounter.  As Joe did so, the grinning man left the

---

[2]     According to Joanna, on this third occasion the stranger continued to stare at them for thirty to forty-five seconds.

[3]     Joe explained:

> I wasn't sure what the motive was.  I didn't know if there was – maybe when we pulled in we cut somebody off, not knowing it and upset them.  So, you know, if they were out to get us or if there was a robbery in progress.  I wasn't sure what the situation was, why this was happening or what provoked this person to do this.

On cross-examination, Joe admitted that he had witnessed no criminal conduct and that the man had made no overtly threatening gestures towards them.  Asked whether the man had made "any movements or articulations of any kind that caused you to believe that the individual was about to commit a crime against you?", Joe replied, "I don't know how to define that, whether it was just a feeling we had that – by being stared down, that something wasn't right.  Let me put it that way."

For her part, Joanna testified that she felt "[f]ear.  I didn't know what he wanted.  I didn't know if he was going to rob us.  If – I didn't know what he wanted.  I was just afraid at that point." She also admitted on cross-examination that she had witnessed no clear-cut criminal behavior or threat, but nevertheless, she "felt like he was stalking us."

McDonald's and drove into the parking lot of the adjacent Wal-Mart. The Holdens observed

him engage in what appeared to be similar conduct, pulling up beside at least two parked cars

in the Wal-Mart parking lot and tarrying there, although they could not see what the man was

doing from that distance in the darkness. Joe relayed to the 911 dispatcher:

> who I was, and as I started to tell him why we were calling, my wife started
> giving me the description of the car and the license plates. I gave that to
> dispatch and told them that there was – I don't remember the exact words, but
> basically there was some suspicious behavior with the vehicle. And, you
> know, kind [of?] what they had done.[4]

Joe continued to describe the man's activity in the Wal-Mart parking lot to the dispatcher

until the police arrived and converged on the car that he had described.[5] The dispatcher

asked them to remain on the scene, and a short time later they talked with one of the officers,

giving him their contact information.

Officer Carraby of the Lewisville Police Department, fresh out of the academy with

less than a year's experience on the force, received a computer message from his dispatcher

about a suspicious car that was "circling the parking lot of Wal-Mart and McDonald's."

Supplied with the make, model, color and license plate number of the suspicious car, Carraby

---

[4]

    At trial, Joe could not recall whether he told the dispatcher how he and his wife were made to feel during this encounter, but he did reiterate that he had related "what the vehicle was doing."

[5]

    Joanna testified at trial:

>     I remember just watching the vehicle. And, of course, my husband is still on
> the phone with 911. And as he's on the phone with 911, I am relaying: He's moving
> here, moving there; he's moving closer to the door at Wal-Mart. And at that point,
> the police officers came in.

spotted it right away as it drove down one side of the Wal-Mart parking lot and pulled into a space. Carraby acknowledged that the only information he had to base reasonable suspicion on was the dispatcher's broadcast that a citizen by the name of Joe Holden was reporting a suspicious vehicle. The dispatcher did not pass along the details that had served to raise the Holdens' suspicions.[6] After the police "surrounded" the car,[7] Carraby approached it and "contacted" the driver, whom he identified in court as the appellant. When the appellant rolled down the driver's side window, Carraby "smelled a strong odor of alcoholic beverage coming from the vehicle," and he began a DWI investigation that culminated in the appellant's prosecution.

After trial, the trial court entered written findings of fact and conclusions of law with respect to the legality of the appellant's detention. Not all of the trial court's findings are supported by the record.[8] However, the following findings of fact do find record support:

---

[6] All that Carraby knew, other than Joe Holden's name and the identifying characteristics of the car, was that "[t]he complainant thought that the vehicle was suspicious and wanted us to check it out." He "didn't have any idea about what specific activity . . . created the suspicion[.]"

[7] Carraby acknowledged that three police units arrived and surrounded the appellant's car in a parking space so that he could not leave. The State argued on appeal that the initial exchange between the appellant and the police was only an encounter, not a detention, and that there was no requirement of reasonable suspicion to justify it. The court of appeals held otherwise, *id*. at 809-10, and we declined to grant discretionary review of this issue. For purposes of this opinion, we therefore assume that the appellant was detained for investigative purposes. The only issue currently before us is the legality of the investigative detention.

[8] For example, in one of its findings of fact the trial court found:

Although Officer Carraby testified that he could not remember if dispatch had

1.	On December 31, 2006, around 8:00p.m., Joe Holden and his wife Joanna observed the [appellant] driving around the parking lot of McDonalds located in Lewisville, TX. The [appellant] was parking next to their vehicle for short periods of time, staring and grinning at the Holdens. The Holdens did not know the [appellant];

2.	Joe Holden and his wife Joanna had called 911 and reported the [appellant's] odd behavior and fear that the [appellant] might be about

---

provided any information from [the] Holdens of any specific crime that had been committed or was about to be committed by the [appellant], he did testify that he had reasonable suspicion to believe that there was possible criminal activity underway or about to occur based on the information provided by dispatch[.]

This finding is misleading at best, in two respects. First, Carraby had no independent recollection of what dispatch had told him *at all*. He was allowed to refresh his memory with his offense report, however, and once he did so he testified:

> I don't remember from memory, but based on the document that I'm reading, it was a suspicious subject phone call. The witness advised they saw a small gray car. They gave the . . . Texas license plate number as . . . 971 MPM, circling the parking lot of Wal-Mart and McDonald's. The complainant thought that the vehicle was suspicious and wanted us to check it out.

If anything, the inference to be drawn from this, as well as from the balance of Carraby's testimony, *see* note 6, *ante*, is simply that the dispatcher never provided him with any information about a specific crime that the appellant had committed or was about to commit—*not* that he could not remember *whether* dispatch had so informed him. Second, Carraby never specifically testified that he believed he had a reasonable suspicion to detain the appellant. He was never asked to give, and did not offer, any opinion whatsoever with respect to this question of law. He did testify that he personally believed "there was possible criminal activity afoot" by virtue of the fact that, although not against the law, "it's not normal for vehicles to drive around the parking lot at 8:00 o'clock at night."

In another of its findings of fact, the trial court found that Carraby "corroborated the Holden's [sic] strange behavior and suspicion of criminal activity by contacting the [appellant] and observing signs that he was intoxicated[.]" This finding, while well enough supported by the record, is irrelevant to the question whether the initial stop of the appellant was lawful. That the appellant appeared intoxicated came to light only after the challenged detention was a fait accompli. It cannot be invoked retroactively to help justify that detention. *Cf. Florida v. J. L.*, 529 U.S. 266, 271 (2000) ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search."); *Crain v. State*, 315 S.W.3d 43, 52-53 (Tex. Crim. App. 2010) (same).

to commit an unknown crime against them or someone else;

\* \* \*

6.      The Holdens provided 911 with detailed description of the [appellant's] vehicle to include the make, model, color, and complete license plate number of his car;

7.      When Officer Carraby arrived at the scene after receiving the Holden's information from dispatch, he observed [the car they had described] driving through the Wal-Mart parking lot. This information corroborated the specific description provided to dispatch by Joe Holden;

8.      The Holdens remained on the scene after the Lewisville police arrived, thereby placing themselves in a position to be held accountable for their report[.]

From these facts, and reasoning from the opinion of this Court in *Bobo v. State*,[9] the trial court concluded:

Like the officer in *Bobo*, Officer Carraby was presented with information by an identified informant of an individual's suspicious activity but no specific criminal act. Officer Carraby was able to identify the [appellant's] vehicle from the specific description provided to him by the Holdens at the location they reported, thereby corroborating the tip he had received. Based on Officer Carraby's testimony, he clearly had reasonable suspicion to detain the [appellant] to investigate his suspicious behavior and possible involvement in criminal activity.

On appeal, the appellant argued that the trial court erred in denying his motion to suppress.

Over the dissent of one of its members, a panel of the court of appeals agreed.[10]

---

[9] 843 S.W.2d 572 (Tex. Crim. App. 1992).

[10] *Derichsweiler v. State*, *supra*.

## In the Court of Appeals

The court of appeals acknowledged case law from this Court holding that probable cause (if not reasonable suspicion) may be judged by the sum of information known to the police, collectively, at the time of a warrantless arrest.[11] Nevertheless, the court of appeals initially measured reasonable suspicion in this case "by looking at only those facts known to Officer Carraby" at the time he detained the appellant,[12] apparently discounting the specific information that the Holdens supplied to the dispatcher during the 911 call. Because Carraby did not personally observe any criminal behavior, and because the behavior that Carraby *did* observe—the appellant "circling" the Wal-Mart parking lot at 8:00 p.m.—while it may not have been "normal," does not specifically suggest criminal conduct *per se*, the court of appeals concluded that he lacked reasonable suspicion to justify the detention.[13] Along the way, the court of appeals distinguished *Bobo*, upon which the trial court had relied, by observing that the information that had been known to the detaining officer there specifically suggested that the offense of criminal trespass had been committed.[14]

---

[11]

*Id*. at 810-11 (*citing Fearance v. State*, 771 S.W.2d 486, 509 (Tex. Crim. App. 1988) for the proposition that probable cause to arrest is determined according to "the sum of the information known to the cooperating officers").

[12]

*Derichsweiler v. State*, *supra*, at 810.

[13]

*Id*. at 812.

[14]

*Id*. at 811.

Alternatively, the court of appeals held that, even considering the specific information that the Holdens had observed and imparted to the 911 dispatcher, but which was never passed along to Carraby, as part of the totality of the circumstances known collectively to the police, reasonable suspicion was still lacking to support the appellant's detention.[15] Nothing that the Holdens observed "could be described as criminal activity[.]"[16] For this reason, the court of appeals held, the Holdens' information could not serve to supply the deficits in Carraby's personal observations that would complete the scenario for reasonable suspicion, even under the totality of the circumstances.[17]

Justice Gardner disagreed. She argued in dissent that the majority erred to require, as a prerequisite to reasonable suspicion, that the information making up the totality of the circumstances must include some specific observation of a crime.[18] Like the trial court, she believed our opinion in *Bobo* to be controlling and disagreed with the majority's contention that the defendant in *Bobo* had been observed engaging in criminal trespass.[19] Ultimately, Justice Gardner found that the totality of the circumstances, though comprised of innocent

---

[15] *Id*. at 812.

[16] *Id*.

[17] *Id*.

[18] *Id*. at 814 (Gardner, J., dissenting).

[19] *Id*.

enough conduct on the appellant's part, was nevertheless sufficient in the aggregate to provide reasonable suspicion to believe that he was committing the offense of driving while intoxicated.[20] We granted the State's petition for discretionary review to address whether the court of appeals erred by requiring some observation of a specific criminal offense as a necessary component of reasonable suspicion under the totality of the circumstances.[21]

## THE LAW

### Standard of Review

In reviewing a trial court's ruling on a pre-trial motion to suppress, an appellate court must give almost total deference to the trial court's resolution of questions of historical fact and of mixed questions of law and fact that turn on the weight or credibility of the evidence.[22] The trial court's findings of fact, as we have set out in the text above, are amply supported by the record. In any event, in this particular case, whether there was a reasonable suspicion to detain the appellant does not turn on the demeanor or credibility of the witnesses, but on the legal significance of the facts they recounted. Accordingly, we accept the trial court's findings of fact as recounted above as true and proceed, *de novo*,[23] to the legal question

---

[20] *Id*. at 816.

[21] TEX. R. APP. P. 66.3(c).

[22] *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007).

[23] *Id*. ("The appellate courts review *de novo* 'mixed questions of law and fact' that do not depend upon credibility and demeanor.").

whether the totality of the circumstances as so construed satisfied the State's burden to prove that the appellant's warrantless investigative detention was supported by reasonable suspicion.[24]

## Reasonable Suspicion

Under the Fourth Amendment, a warrantless detention of the person that amounts to less than a full-blown custodial arrest must be justified by a reasonable suspicion.[25] A police officer has reasonable suspicion to detain if he has specific, articulable facts that, combined with rational inferences from those facts, would lead him reasonably to conclude that the person detained is, has been, or soon will be engaged in criminal activity.[26] This standard is an objective one that disregards the actual subjective intent of the arresting officer and looks, instead, to whether there was an objectively justifiable basis for the detention.[27] It also looks

---

[24]

*Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005) (once defendant shows police detained him without a warrant, burden shifted to State to establish reasonable suspicion to justify it).

[25]

*Id*. *See also*, United States v. Sokolow, 490 U.S. 1, 7 (1989) ("police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause.") (internal quotation marks omitted); *Brown v. Texas*, 443 U.S. 47, 51 (1979) (same).

[26]

*United States v. Sokolow*, *supra*; *Crain v. State*, *supra*, at 52. *See Terry v. Ohio*, 392 U.S. 1, 21-22 (1968) ("the police officer must be able to point to specific and articulable facts which, if taken together with rational inferences from those facts, reasonably warrant" an investigative detention, and "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution in the belief that the action taken was appropriate") (internal quotation marks omitted).

[27]

*Terry v. Ohio*, *supra*.

to the totality of the circumstances;[28] those circumstances may all seem innocent enough in isolation, but if they combine to reasonably suggest the imminence of criminal conduct, an investigative detention is justified.[29] "[T]he relevant inquiry is not whether particular conduct is innocent or criminal, but the degree of suspicion that attaches to particular non-criminal acts."[30] Moreover, the detaining officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain;[31] rather, "the cumulative information known to the cooperating officers at the time of the stop is to be considered in determining whether reasonable suspicion exists."[32] A 911 police dispatcher is ordinarily regarded as a "cooperating officer" for purposes of making this determination.[33] Finally,

---

[28]

*United States v. Cortez*, 449 U.S. 411, 417-18 (1981) ("the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account.").

[29]

*Reid v. Georgia*, 448 U.S. 438, 441 (1980); *United States v. Sokolow*, *supra*, at 9-10; *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).

[30]

*Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997).

[31]

*Adams v. Williams*, 407 U.S. 143, 147 (1972).

[32]

*Hoag v. State*, 728 S.W.2d 375, 380 (Tex. Crim. App. 1987). *See United States v. Hensley*, 469 U.S. 221, 232-33 (1985) (officer may detain suspect based upon police bulletin so long as issuing entity has reasonable suspicion to justify detention); *Illinois v. Andreas*, 463 U.S. 765, 771 n.5 (1983) ("where law enforcement authorities are cooperating in an investigation, the knowledge of one is presumed shared by all.").

[33]

*See*, *e.g.*, *United States v. Whitaker*, 546 F.3d 902, 909 n.12 (7th Cir. 2008) ("911 calls by identified callers can provide the police with reasonable suspicion and . . . 911 employees are part of the police collective."); *United States v. Ruidiaz*, 529 F.3d 25 (1st Cir. 2008) (officer could rely on information passed on by 911 dispatcher in formulating reasonable suspicion); *United States v.*

information provided to police from a citizen-informant who identifies himself and may be held to account for the accuracy and veracity of his report may be regarded as reliable.[34]  In such a scenario, the only question is whether the information that the known citizen-informant provides, viewed through the prism of the detaining officer's particular level of knowledge and experience,[35] objectively supports a reasonable suspicion to believe that criminal activity is afoot.

## ANALYSIS

### What Is *Not* At Issue Here

There is no issue in this case with respect to the reliability of the information supplied

---

*Fernandez-Castillo*, 324 F.3d 1114, 1118 (9th Cir. 2003) ("Although the Highway Patrol dispatcher distilled and paraphrased [the] information" supporting reasonable suspicion, court considered it part of the collective knowledge of the police);  *United States v. Kaplansky*, 42 F.3d 320, 327 (6th Cir. 1994) ("where officers are told to investigate a situation without being told all of the facts justifying investigation, the court must look beyond the specific facts known to the officers on the scene to the facts known to the dispatcher.").  *But see, contra*: *United States v. Colon*, 250 F.3d 130 (2nd Cir. 2001) (collective-knowledge doctrine does not embrace information known to civilian 911 operator that was not passed on to police dispatcher or officers on the scene).

[34]  *Adams v. Williams*, *supra* (tip from known informant who had supplied reliable information in the past, and who could have been arrested for false report, deemed sufficiently reliable to satisfy reasonable suspicion standard even if his information might not have supplied probable cause). *See* Wayne R. LaFave, 4 SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 9.5(h) at 576 & n.453 (4th ed. 2004) (cases finding reasonable suspicion that "involve nothing more than permitting a stop upon suspicious circumstances reported to the police by a reliable person in a nonconclusory fashion" are "unobjectionable under any reasonable view of how the *Terry* standard should be applied").

[35]  *Cf. Texas v. Brown*, 460 U.S. 730, 742-43 (1983) (plurality opinion) (officer's knowledge, experience and training are relevant in determination whether he had probable cause to believe item he observed in plain view constituted contraband).

by the citizen-informants—the Holdens. As the trial court found, they identified themselves to the 911 dispatcher and remained answerable for their report after the fact. That report was based upon their own first-hand perceptions, many of which they continuously and contemporaneously narrated to the police via the 911 dispatcher. Nor do we hesitate to include what the Holdens reported as part of the objective information that Officer Carraby was entitled to rely upon in making the investigative stop. Even if Carraby was not personally aware of the detailed information the Holdens had reported to substantiate their perception that the appellant's car was "suspicious," the 911 dispatcher was. The trial court specifically found that the Holdens described the appellant's conduct, both as directed at them in the McDonald's parking lot, and later, as it was apparently directed at others (or at least at other cars) in the parking lot of the Wal-Mart, to the 911 dispatcher. It matters not that the dispatcher did not pass all of these details along to the responding officers. In assessing reasonable suspicion, *vel non*, a reviewing court looks to the totality of objective information known *collectively* to the cooperating police officers, including the 911 dispatcher.[36] The issue in this case boils down, therefore, simply to whether the totality of that reliable information provided specific, articulable facts that, combined with reasonable inferences to be derived from those facts, would lead to the reasonable conclusion that the appellant was committing, or soon would be engaged in, some type of criminal activity.

---

[36] *See* notes 32 and 33, *ante*.

### Reasonable Suspicion of a Particular Offense?

As the appellant argues, the facts invoked to justify an investigative detention must support more than a mere hunch or good-faith intuition that criminal activity is afoot.[37] To support a reasonable suspicion, the articulable facts must show "that some activity out of the ordinary has occurred, some suggestion to connect the detainee to the unusual activity, and *some indication that the unusual activity is related to crime*."[38] Does this mean that the facts must point distinctively to the actual or impending commission of a particular penal code offense? The court of appeals majority seems to have believed so. The point of contention between the majority and dissenting opinions below hinged upon their competing interpretations of *Bobo*. The majority believed that the articulable facts supporting the stop in *Bobo* provided sufficient reason to believe that a criminal trespass had occurred.[39] Justice Gardner disagreed that *Bobo* turned on a finding that the facts pointed to a particular and distinct penal offense.[40] We conclude that the majority below erred to the extent that its opinion may be read for the proposition that facts adduced to give rise to a reasonable suspicion must show that the detainee has committed, is committing, or is about to commit,

---

[37] *Crain v. State*, *supra*, at 52.

[38] *Meeks v. State*, 653 S.W.2d 6, 12 (Tex. Crim. App. 1983) (emphasis added).

[39] *Derichsweiler v. State*, *supra*, at 811.

[40] *Id*. at 814 (Gardner dissenting).

a particular and distinctively identifiable penal offense.

Unlike the case with probable cause to justify an arrest, it is not a *sine qua non* of reasonable suspicion that a detaining officer be able to pinpoint a particular penal infraction. The reason is simple but fundamental. A brief investigative detention constitutes a significantly lesser intrusion upon the privacy and integrity of the person than a full-blown custodial arrest. For this reason, a warrantless investigative detention may be deemed "reasonable" for Fourth Amendment purposes on the basis of a lesser quantum or quality of information—reasonable suspicion rather than probable cause.[41] Likewise, because a detention is less intrusive than an arrest, the specificity with which the articulable information known to the police must demonstrate that a particular penal offense has occurred, is occurring, or soon will occur, is concomitantly less. It is, after all, only an "investigative" detention. So long as the intrusion does not exceed the legitimate scope of such a detention and evolve into the greater intrusiveness inherent in an arrest-*sans*-probable-cause, the Fourth Amendment will tolerate a certain degree of police proaction. Particularly with respect to information suggesting that a crime is *about* to occur, the requirement that there be "some indication that the unusual activity is related to crime"[42] does not necessarily

---

[41] *See Alabama v. White*, 496 U.S. 325, 330 (1990) ("Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.").

[42] *Meeks v. State*, *supra*.

mean that the information must lead inexorably to the conclusion that a particular and identifiable penal code offense is imminent. It is enough to satisfy the lesser standard of reasonable suspicion that the information is sufficiently detailed and reliable—*i.e.*, it supports more than an inarticulate hunch or intuition—to suggest that *something* of an apparently criminal nature is brewing.

While it is admittedly a close call, the information known collectively to the police in this case ultimately satisfies this standard. The appellant's conduct, particularly as directed at the Holdens, while not overtly criminal in any way, was bizarre to say the least. Moreover, the repetition of similar, apparently scrutinizing, behavior directed at parked cars in the adjacent Wal-Mart parking lot reasonably suggests a potential criminal motive that transcended any particular interest in the Holdens themselves. It reasonably suggests someone who was looking to criminally exploit some vulnerability—a weak or isolated individual to rob or an unattended auto to burgle. It matters not that all of this conduct could be construed as innocent of itself; for purposes of a reasonable-suspicion analysis, it is enough that the totality of the circumstances, viewed objectively and in the aggregate, suggests the realistic possibility of a criminal motive, however amorphous, that was about to be acted upon. Under these circumstances, the Fourth Amendment permits the police to make a brief stop to investigate, if only by their presence to avert an inchoate offense.

Nothing about our opinion in *Bobo* is inconsistent with this holding. In *Bobo*, the defendant and a companion were observed by a citizen-informant "milling around some

townhouses."[43]   It is true that, at another point in *Bobo*, we characterized this as an observation that the defendant and his companion were "in an area where they should not be[.]"[44] But we never explained this characterization and never expressly declared that Bobo had thereby committed the offense of criminal trespass.  We simply held:

> The report of a citizen identifying suspicious persons around several homes, the observation of appellant, who matched the description in the report, leaving in an automobile subsequent to the report and [the detaining officer's] experience all provided [the officer] a reasonable articulable suspicion that appellant was connected with criminal activity.[45]

So far as we know, it is *not* a criminal trespass simply to "mill around" townhouses.  Even so, under the totality of the circumstances, we held that the detaining officer had reasonable suspicion to detain Bobo.  We likewise hold today that the totality of circumstances, including the appellant's strangely persistent, if admittedly non-criminal, behavior, gave rise to a reasonable suspicion that he was about to engage in criminal activity.[46]

---

[43] 843 S.W.2d at 573.

[44] *Id*. at 575.

[45] *Id*.

[46] Indeed, it is arguable that this case presents more compelling facts to support reasonable suspicion than does *Bobo*.  There is no indication in our opinion in *Bobo* that the citizen-informant ever explained to any member of the police collective what it was that made Bobo's presence around the townhouses suspicious.  Our opinion does not clearly indicate that it was the citizen-informant who knew that Bobo and his companion were "in an area where they should not be[,]" much less how he might have come to that opinion.  Here the record supports the conclusion that the Holdens described the appellant's bizarre behavior to the 911 dispatcher, so that the police collective had specific information how and why the appellant's conduct aroused suspicion of criminal activity.

**CONCLUSION**

For the foregoing reasons, we reverse the judgment of the court of appeals.  The cause

is remanded to that court to address the appellant's remaining points of error.[47]

DELIVERED:      January 26, 2011
PUBLISH

---

[47] *See* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that . . . addresses every issue raised and necessary to final disposition of the appeal.").