ACCEPTED
03-15-00221-CR
5928122
THIRD COURT OF APPEALS
AUSTIN, TEXAS
7/2/2015 4:44:03 PM
JEFFREY D. KYLE
CLERK

## No. 03-15-00221-CR

In the Third Court of Appeals
Austin, Texas

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
7/2/2015 4:44:03 PM
~~JEFFREY D. KYLE~~
Clerk

# MICHAEL GRACE,
*Appellant,*

## v.

# THE STATE OF TEXAS,
*Appellee.*

On appeal from the County Court-at-Law Number Six,
Travis County, Texas
Trial Cause No. C-1-CR-13-211885

# STATE'S BRIEF

DAVID A. ESCAMILLA
TRAVIS COUNTY ATTORNEY

GISELLE HORTON
ASSISTANT TRAVIS COUNTY ATTORNEY
State Bar Number 10018000
Post Office Box 1748
Austin, Texas 78767
Telephone: (512)854-9415
TCAppellate@traviscountytx.gov

*July 2, 2015*                ATTORNEYS FOR THE STATE OF TEXAS

ORAL ARGUMENT IS NOT REQUESTED

# TABLE OF CONTENTS

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUE PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT

    *Reply point*: The trial court did not abuse its discretion
    in denying suppression relief because the initial
    detention was lawful . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    1.     Grace's contentions on appeal . . . . . . . . . . . . . . . . . . . . . . . . 10

    2.     Because the bar doorman identified himself,
         his report to police is presumed reliable . . . . . . . . . . . . . . . . . 11

    3.     Under the totality of the circumstances, the detaining
         officer had reasonable suspicion to initiate a brief
         detention for investigatory purposes . . . . . . . . . . . . . . . . . . . . 13

         3.1.   Grace has ignored the collective-knowledge doctrine,
             under which the police dispatcher's knowledge is
             imputed to all cooperating officers . . . . . . . . . . . . . . . . . 14

3.2.   Ignoring the imputed- or collective-knowledge
rule has, in turn, caused Grace to misapply both
the totality test and the standard of appellate review . . 15

3.3.   Properly viewed, the record shows that the
detention was lawful . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

# INDEX OF AUTHORITIES

**Statute**                                                          **Page**

TEX. PENAL CODE § 37.08

    (West Supp. 2014) .................................... 13


**Rule**

TEX. R. APP. P. 701 ......................................... 17


**Cases**

*Alabama v. White*, 496 U.S. 325

    (1990) ............................................ 11

*Brother v. State*, 166 S.W.3d 255

    (Tex. Crim. App. 2005) ............................ 12

*Derichsweiler v. State*, 348 S.W.3d 906

    (Tex. Crim. App. 2011) ...................... 12, 13, 14, 15

*Hime v. State*, 998 S.W.2d 893

    (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) ............... 12

*Howard v. State*, 744 S.W.2d 640

    (Tex. App.—Houston [14th Dist.] 1987, no pet.) ................ 17

*Illinois v. Gates*, 462 U.S. 213

    (1983) ............................................ 12

*Martinez v. State*, 348 S.W.3d 919

    (Tex. Crim. App. 2011) ............................ 13

*Nacu v. State*, 373 S.W.3d 691

    (Tex. App.—San Antonio 2012, no pet.) .................... 18, 19

*Pipkin v. State*, 114 S.W.3d 649

    (Tex. App.—Fort Worth 2003, no pet.) ...................... 12

*Reesing v. State*, 140 S.W.3d 732

    (Tex. App.—Austin 2004, pet. ref'd) ....................... 13

*State v. Fudge*, 42 S.W.3d 226

    (Tex. App.—Austin 2001, no pet.) ........................ 12

*State v. Garcia-Cantu*, 253 S.W.3d 236

    (Tex. Crim. App. 2008) ............................ 15

*State v. Ross*, 32 S.W.3d 853
 (Tex. Crim. App. 2000) ................................. 15

*State v. Stolte*, 991 S.W.2d 336
 (Tex. App.—Fort Worth 1999, no pet.) ........................ 12

*Taflinger v. State*, 414 S.W.3d 881
 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ................ 12

*United States v. Basey*, 816 F.2d 980
 (5th Cir. 1987) ......................................... 12

*Ware v. State*, 724 S.W.2d 38
 (Tex. Crim. App. 1986) ................................. 12

## STATEMENT OF THE CASE

The State charged Grace by information with operating a motor vehicle while intoxicated (DWI), enhanced by a prior conviction. CR 18. After the trial court held a pre-trial evidentiary hearing and denied the suppression relief he requested, Grace pleaded no contest to the charge. CR 36–37. On February 3, 2015, the trial court sentenced Grace in accordance with a plea agreement to one year in jail and a $4,000 fine, but suspended imposition of this sentence and placed Grace on community supervision (probation) for two years. CR 38. As conditions of probation, Grace was required to serve five days in the Travis County Jail, complete a DWI offender program, comply with an ignition-interlock program, complete 100 hours of community-service restitution, and surrender his driver's license for one year. CR 38–41.

Grace filed a new-trial motion on March 3, 2015. CR 47–48. He gave written notice of appeal on April 7, 2015. CR 55.

1

Did the police officer have reasonable suspicion to detain Grace when all he knew were the readily observable descriptors of car and driver, and the allegation that the driver was drunk?

## BACKGROUND

As the bar was closing at about two o'clock in the morning, Cary Allen, the doorman at Ego's Karaoke Bar, called 9-1-1 to report that a man (later identified as Grace) was drunk, sitting in his car with a passenger, and about to drive away. 2 RR 12; 4 RR State's Exhibit #1 @ 0:03–2:26 [the first 9-1-1 call]. Allen identified himself to the police dispatcher by his full name, and related that, as the bar doorman, "we've had police before, and they told me it's always better to catch them in the car before they leave, rather than . . . waiting until they leave the property[.]" 4 RR State's Exhibit #1 @ 1:40–1:51. The following is a transcription of the first of Allen's two calls to 9-1-1.

0:03   9-1-1 DISPATCHER:   Austin 9-1-1. Do you need police, fire, or EMS?

2

0:06 CARY ALLEN: I need to report a drunk driver.

0:08 9-1-1 DISPATCHER: Okay. What road is he on?

0:10 CARY ALLEN: He is at, uh, the parking lot of, uh, Ego's Karaoke Bar, 510 South Congress Avenue. He's a guest at the bar who, uh, left the bar intoxicated. I urged him not to drive. But he is sitting in his Scion in the parking lot. I know he's about to take off.

0:23 9-1-1 DISPATCHER: Okay, what color is his Scion?

0:25 CARY ALLEN: It's a blue Scion.

0:27 9-1-1 DISPATCHER: Can you see the license plate?

0:29 CARY ALLEN: Yes sir. It's B, J, N, 19-67. He's in the parking lot now. It's a, uh, Caucasian male with a grey beard—probably about fifty-five, sixty years old.

0:42 9-1-1 DISPATCHER: Let me go and read back the license plate to make sure I've got it correctly. I've got Boy, John, Nancy, 1, 9, 6, 7?

0:49 CARY ALLEN: That is correct.

0:50 9-1-1 DISPATCHER: Is that a Texas license plate?

0:51 CARY ALLEN: Blue, uh, er, it's a Texas license plate. Yes, sir.

3

| | | |
|---|---|---|
| 0:54 | 9-1-1 DISPATCHER: | Okay, he's a white male fifties or sixties, with a grey beard? |
| 0:58 | CARY ALLEN: | (Unintelligible.) |
| 1:01 | 9-1-1 DISPATCHER: | What was that? |
| 1:04 | CARY ALLEN: | I'm sorry sir, I'm the doorman at the bar. I've got some customers that are leaving. |
| 1:09 | 9-1-1 DISPATCHER: | Okay, that's fine. What's your name? |
| 1:11 | CARY ALLEN: | My name is Cary: C-A-R-Y. Allen: A-L-L-E-N. |
| 1:17 | 9-1-1 DISPATCHER: | Okay. And do you want us to talk to you in person or no? |
| 1:21 | CARY ALLEN: | I'm at the bar right now. I'm the doorman at the bar they're at. |
| 1:24 | 9-1-1 DISPATCHER: | Right, so what I've done is . . . |
| 1:26 | CARY ALLEN: | So, I mean if it's necessary, I'm at the bar. I'm sorry, what's that? |
| 1:30 | 9-1-1 DISPATCHER: | I've got this processed as a public intoxication. Now once he leaves and it changes and it becomes a D–a DWI. So, we're headed there right now in hopes we can catch him before he leaves. |
| 1:40 | CARY ALLEN: | Okay. You know what, we've had police before, and they told me it's always better to |

catch them in the car before they leave, rather than, uh, waiting until they leave the property and then calling the cops—if that makes sense.

1:51  9-1-1 DISPATCHER:     Completely true, sir. That's why we're on our way right now.

1:52  CARY ALLEN:          Okay.

1:53  9-1-1 DISPATCHER:     Now if he does leave, I want you to call us back and tell us what direction he went. Can you do that?

1:57  CARY ALLEN:          Yes, sir. You know I can. He's parked in there. Like. I mean, they're—they're drunk. So they're just sitting in their car with their lights on.

2:05  9-1-1 DISPATCHER:     Yeah. I understand. But once we get out there, do you want us to talk to you in person or no? It's a matter of personal preference for you.

2:12  CARY ALLEN:          Uh, I mean if, if, if it's all the same I've got a bar to close down, but if they need to talk to me, I'm inside the bar.

2:17  9-1-1 DISPATCHER:     Okay, I'll tell them that. Alright, thanks, sir.

2:19  CARY ALLEN:          Alright.

2:20  9-1-1 DISPATCHER:     If anything . . .

| 2:20 | CARY ALLEN: | Hey, thank you very much. Be safe. |
| 2:22 | 9-1-1 DISPATCHER: | Oh, no problem. You, too. Bye. |
| 2:23 | CARY ALLEN: | Alright. Bye. |

Consistent with the remarks about the desirability of preventing drunks from actually driving, Allen testified that he called 9-1-1 to ensure Grace's safety. 2 RR 18.

At 2:07 a.m., Austin Police Officer Larry Wright received a public-intoxication call from the dispatcher. 2 RR 23–24. The call relayed the doorman's name and telephone number, and described the suspect—a white male with a grey beard, approximately 50 years old—and his car—a blue Scion with license plate number BJN-1967. 2 RR 24–25. Wright testified that, in his experience, intoxication-related offenses are a concern at that time of morning and in that part of town. 2 RR 28. He was familiar with Ego's and its parking lot from past police experience. 2 RR 37. "We've had several calls there for various reasons. Fights or public intoxication calls or DWI or reckless calls from that bar numerous times." 2 RR 25.

Wright was on his way to Ego's when Allen called 9-1-1 a second time to update the information: the driver had left the parking lot and was now southbound on South Congress Avenue. 2 RR 25–26.

| | | |
|---|---|---|
| 2:30 | 9-1-1 DISPATCHER: | Austin 9-1-1. Do you need police, fire, or EMS? Austin 9-1-1. |
| 2:33 | CARY ALLEN: | I just called to report a drunk driver from, uh, Ego's Karaoke Bar at 510 South Congress Avenue. He was sitting in the parking lot and he just took off southbound on South Congress Avenue. |
| 2:45 | 9-1-1 DISPATCHER: | What kind of vehicle was it? |
| 2:48 | CARY ALLEN: | It's a blue Scion. |
| 2:53 | 9-1-1 DISPATCHER: | Okay. Am I speaking to Mr. Allen? |
| 2:55 | CARY ALLEN: | That is correct. |
| 2:58 | 9-1-1 DISPATCHER: | And you said it was southbound. |
| 3:00 | CARY ALLEN: | Yes sir. The dispatcher told me to—southbound on South Congress Avenue—the dispatcher told me to call back and let you all know if he had left the property. |

| 3:10 | 9-1-1 DISPATCHER: | Okay, we got that call in. The officers are already, uh, near. And, uh, thank you for calling back so they know where to go. |
| 3:17 | CARY ALLEN: | Thank you very much. |
| 3:18 | 9-1-1 DISPATCHER: | Thank you. |
| 3:20 | CARY ALLEN: | Alright, bye bye. |

4 RR State's Exhibit #1 @ 2:30–3:20 [the second 9-1-1 call].

Just as the police dispatcher updated the call with this information, Officer Wright saw a blue Scion with that specific license plate number, traveling southbound. 2 RR 26. Without observing any traffic violations or erratic driving, Wright pulled the car over, got out, and approached the passenger side. 2 RR 33. DWI enforcement officers were already on the scene, and handled the investigation that led to Grace's arrest for DWI–second offense. 2 RR 29.

## SUMMARY OF THE ARGUMENT

Grace's divide-and-conquer approach involves a number of analytical missteps. He first begins by relying on anonymous-tipster and confidential-informant cases. Based on that reliance, he then dismisses

8

corroborative evidence as "readily observable" and therefore unworthy of any consideration. Finally, he focuses on one word—"drunk"—to conclude that the only information properly before the detaining officer was fatally conclusory. These arguments

- rely on inapplicable case law;

- ignore the collective- or imputed-knowledge doctrine or rule, under which the information known to the dispatcher is imputed to all cooperating officers; and

- misapply the standard of review and the totality test by ignoring or miscasting significant facts.

Unlike the anonymous tipster or the confidential informant, the doorman was an identified citizen who contemporaneously reported the criminal misconduct he saw. His report is therefore inherently credible and reliable under binding precedent.

Furthermore, the law imputes to the detaining officer a knowledge of all that the doorman relayed to the dispatcher. The only question, then, is whether the information that the doorman provided—viewed through the prism of the detaining officer's particular level of knowledge and

9

experience—objectively supported a reasonable suspicion to believe that criminal activity was afoot.

Among other things, Grace ignores (1) the detaining officer's experience with intoxication-related arrests at this particular time, area, bar, and parking lot; and (2) the doorman's experience with drunks and his previous calls to police in similar situations. But seen as the standard of review requires, the totality of the circumstances objectively supports a reasonable suspicion of criminal activity to justify the initial detention for investigative purposes.

## ARGUMENT

*Reply point*: **The trial court did not abuse its discretion in denying suppression relief because the initial detention was lawful.**

## 1. Grace's contentions on appeal.

Relying on an anonymous-tip and a confidential-informant case, Grace contends that the bar doorman's unreliable, conclusory tip could not have provided the requisite reasonable suspicion. Specifically, he maintains that the doorman's specific description of Grace and the car he

10

was driving were not entitled to any weight because they were readily observable. And, without those particulars, he contends, the only information that the officer could rely on was the doorman's conclusory allegation of intoxication, which gave no basis for testing his credibility.

2. **Because the bar doorman identified himself, his report to police is presumed reliable.**

Courts have generally identified three categories of informants: the anonymous informant, the known informant (someone from the criminal world who has previously provided reliable tips), and the identified citizen-informant. The United States Supreme Court has acknowledged the relevance of these categories to an informant's reliability, and has observed, for example, that an anonymous informant is comparatively unreliable and his tip, therefore, will generally require independent police corroboration. *Alabama v. White*, 496 U.S. 325, 329 (1990).

Grace has mistakenly relied on anonymous-tip and confidential-informant cases when analyzing the doorman's reliability. According to the Supreme Court, an identified citizen-informant's report is highly

11

reliable; a strong showing as to other indicia of reliability is therefore

unnecessary.

> If an unquestionably honest citizen comes forward with a
> report of criminal activity—which if fabricated would subject
> him to criminal liability—we have found rigorous scrutiny of
> the basis of his knowledge unnecessary.

*Illinois v. Gates*, 462 U.S. 213, 233–34 (1983).

The doorman's report is also reliable under Texas law. Texas cases

consistently hold that information is inherently credible and reliable when

the police receive it from an identified or identifiable private citizen-

eyewitness who initiates contact with the police to report another person's

suspected criminal act.[1] Unlike a person who makes an anonymous

telephone call, the identified citizen-informant cannot lie with impunity

---

[1]    *Derichsweiler v. State*, 348 S.W.3d 906, 914–15 (Tex. Crim. App. 2011);
*Brother v. State*, 166 S.W.3d 255, 257 (Tex. Crim. App. 2005); *Ware v. State*, 724
S.W.2d 38, 40 (Tex. Crim. App. 1986); *State v. Fudge*, 42 S.W.3d 226, 232 (Tex.
App.—Austin 2001, no pet.); *Taflinger v. State*, 414 S.W.3d 881, 885 (Tex.
App.—Houston [1st Dist.] 2013, no pet.); *Pipkin v. State*, 114 S.W.3d 649, 655 (Tex.
App.—Fort Worth 2003, no pet.); *Hime v. State*, 998 S.W.2d 893, 895
(Tex. App.—Houston [14th Dist.] 1999, pet. ref'd); *State v. Stolte*, 991 S.W.2d 336,
341 (Tex. App.—Fort Worth 1999, no pet.). *See also, United States v. Basey*, 816 F.2d
980, 988 (5th Cir. 1987) ("[C]itizen reports of criminal activity have been deemed
inherently reliable in Texas *Terry*-stop cases.").

because he has put himself in a position to be held accountable for his intervention. *See* TEX. PENAL CODE § 37.08 (West Supp. 2014) (criminalizing false report to a peace officer or law enforcement employee); *Martinez v. State*, 348 S.W.3d 919, 923 (Tex. Crim. App. 2011); *see also Reesing v. State*, 140 S.W.3d 732, 737 (Tex. App.—Austin 2004, pet. ref'd). Indeed, the doorman remained answerable for his report after the fact, even though he was busy closing the bar down. 4 RR State's Exhibit #1 @ 2:12.

Because the doorman's reliability is not in issue on these facts, the only question is whether the information that he provided—viewed through the prism of the detaining officer's particular level of knowledge and experience—objectively supports a reasonable suspicion to believe that criminal activity is afoot. *Derichsweiler*, 348 S.W.3d at 915.

3. **Under the totality of the circumstances, the detaining officer had reasonable suspicion to initiate a brief detention for investigatory purposes.**

Grace focuses on "intoxicated" or "drunk" in the dispatcher's report to the detaining officer, and concludes that the officer relied on fatally conclusory information that did not amount to a reasonable suspicion of

13

criminal activity. This portion of his analysis is flawed for at least three reasons: it ignores the collective- or imputed-knowledge rule; it misapplies the standard of review; and it misapplies the totality test.

### 3.1. Grace has ignored the collective-knowledge doctrine, under which the police dispatcher's knowledge is imputed to all cooperating officers.

Grace mistakenly focuses solely on what the detaining officer knew from the dispatcher's report. But the detaining officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain. *Derichsweiler*, 348 S.W.3d at 914. In a case such as this one,

> [i]t matters not that the dispatcher did not pass all of these details along to the responding officers. In assessing whether reasonable suspicion existed, a reviewing court looks to the totality of objective information known collectively to the cooperating police officers, including the 911 dispatcher.

*Derichsweiler*, 348 S.W.3d at 915.

14

### 3.2. Ignoring the imputed- or collective-knowledge rule has, in turn, caused Grace to misapply both the totality test and the standard of appellate review.

Under the standard of review, the prevailing party is afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *see also State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000) (reviewing court gives "almost total" deference to a trial court's implied determination of historical facts).

Moreover, Grace's mechanistic, divide-and-conquer approach, culminating in his narrow focus on "intoxicated" or "drunk," violates the flexible all-things-considered character of the totality test. For instance, Grace has nothing to say about the detaining officer's training and experience, or the time of day and location, all of which figure into the totality analysis. *Derichsweiler*, 348 S.W.3d at 917.

### 3.3. Properly viewed, the record shows that the detention was lawful.

Officer Wright knew that bars close around two o'clock in the morning and knew from experience that intoxicated pedestrians and drivers are a concern in that area when the bars are closing. 2 RR 28. He was specifically familiar with Ego's from past experience, and testified that he has been called there numerous times on reports of fights or intoxication. 2 RR 25.

The objective signs of intoxication are matters of common knowledge—not rocket science—for the ordinary citizen, and detecting them requires no formal training or expertise. As a bar doorman, however, Allen has vastly more experience dealing with intoxicated persons than the ordinary citizen does.

Contrary to Grace's contentions, the record shows that the doorman had experience detecting intoxication; he had not just started the job yesterday. He told the dispatcher that he called the police before the intoxicated patron actually left the bar's parking lot because "we've had

16

police before, and they told me it's always better to catch them in the car before they leave[.]" 4 RR State's Exhibit #1 @ 1:40. The doorman's experience and his first-hand observations of Grace distinguish the facts of this case from those of *State v. Garcia*, No. 03-14-00048-CR, 2014 Tex. App. LEXIS 9624 (Tex. App.—Austin Aug. 28, 2014, no pet.) (mem. op., not designated for publication), upon which Grace relies.

Furthermore, because the doorman based his opinion on his first-hand observations of Grace, he could have testified to his opinion of intoxication at trial. TEX. R. APP. P. 701; *see Howard v. State*, 744 S.W.2d 640, 641 (Tex. App.—Houston [14th Dist.] 1987, no pet.). The record clearly shows that the doorman interacted with Grace face-to-face as Grace left the bar; he urged Grace not to drive. 4 RR State's Exhibit #1 @ 0:10. The trial court could rationally infer from this up-close interaction that the doorman observed intoxication symptoms that prompted his concern and his immediate calls to police. If a trier may rely on the doorman's opinion to find intoxication beyond a reasonable doubt, then surely cooperating

17

police officers may rely on the experienced doorman's report before briefly detaining to investigate.

This case is most like *Nacu*, in which a restaurant manager told a police officer that a woman who had been in the nearby restaurant was too intoxicated to drive, had gotten into a car in the parking lot, and was now attempting to drive away. *Nacu v. State*, 373 S.W.3d 691, 695 (Tex. App.—San Antonio 2012, no pet.). The manager pointed to Nacu's car, which Nacu was trying to drive between metal poles too narrowly spaced to admit a car. *Id.* at 693. Without stopping to first ascertain the basis of the manager's opinion or even her name, the officer set off to detain. *Id.*

Nacu contended that the manager's statement, "too intoxicated to drive," was purely conclusory. *Id.* at 695–96. The San Antonio Court acknowledge that, viewed in isolation, it was. *Id.* at 696. But the totality of circumstances—which included the manager's explanation that the driver had previously been in her restaurant, was intoxicated, and was trying to drive through poles too narrow to accommodate a car—gave the officer reasonable suspicion based on specific, articulable facts. *Id.* *Nacu* thus

18

recognizes that people often speak in the shorthand of opinions, and not in the form of a recitation of facts. This is especially true when they are faced with an urgent situation, such as the imminent threat to safety that prompted the restaurant manager's—and here, the doorman's—reports.

As in *Nacu*, the facts and inferences of this case, viewed in their totality and in the light most favorable to the ruling, supplied the trial court with specific, articulable facts to support the determination that the detaining officer had reasonable suspicion to detain Grace. *Nacu*, 373 S.W.3d at 696.

## PRAYER

For these reasons, the Travis County Attorney, on behalf of the State of Texas, asks this Court to overrule the point of error and affirm the judgment of conviction for driving while intoxicated—second offense.

Respectfully submitted,

DAVID A. ESCAMILLA
TRAVIS COUNTY ATTORNEY

19

_____

Giselle Horton
Assistant Travis County Attorney
State Bar Number 10018000
Post Office Box 1748
Austin, Texas 78767
Telephone: (512)854-9415
TCAppellate@traviscountytx.gov

ATTORNEYS FOR THE STATE OF TEXAS

## CERTIFICATE OF COMPLIANCE

Relying on Corel WordPerfect's word-count function, I certify that this document complies with the word-count limitations of TEX. R. APP. P. 9.4. The document contains 3812 words.

_____

Giselle Horton

20

## CERTIFICATE OF SERVICE

I certify that I have sent a complete and legible copy of this State's

Brief via electronic transmission, to Mr. Grace's attorney of record, Mr.

Sean Solis, at ssolis@utexas.edu, on or before July 6, 2015.

Giselle Horton
Assistant Travis County Attorney