

# NUMBER 13-18-00359-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

THE STATE OF TEXAS,                                              Appellant,

## v.

BENNY PEREZ,                                                     Appellee.

## On appeal from the County Court at Law No. 2
## of Nueces County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Hinojosa
Memorandum Opinion by Justice Benavides**

By one issue, appellant the State of Texas appeals the trial court's granting of

appellee Benny Perez's motion to suppress. The trial court found that police officers

lacked reasonable suspicion to detain Perez. We affirm.

## I.     BACKGROUND

On March 20, 2016, Perez was approached by law enforcement at a Corpus Christi

area Stripes convenience store. Perez stopped at the convenience store when his girlfriend, Jessica Galbraith, was stopped for committing a traffic violation which led to her arrest for driving while intoxicated. *See* TEX. PENAL CODE ANN. § 49.04. As Galbraith pulled up to a front gas pump, he pulled up on the opposite side at the rear gas pump and got out of his separate vehicle. Corpus Christi Police Officer Samantha Baldwin had effectuated the stop on Galbraith and told Perez, "Sir, you need to get back in your vehicle or you need to go inside, one of the two."

Shortly after, Corpus Christi Police Officers Seth Fretheim and Gilberto Casas arrived on scene. Officer Baldwin met with Officer Fretheim and discussed what had occurred. Officers Fretheim and Casas then approached Perez, who initially denied knowing Galbraith, but did tell them he had a possible felony charge pending. After Perez told them about his possible felony charge, Perez was handcuffed and placed in the back of the patrol unit. Officer Fretheim told Perez he was handcuffed so they could investigate further. The officers ran a check on Perez, which came back negative for any pending charges or warrants. However, they decided to continue to detain Perez and waited on Officer Baldwin to conclude her investigation of Galbraith.

Five minutes and thirty-four seconds after Perez was handcuffed, placed in the back seat of a patrol car, and was cleared by the warrant check, the officers discussed what violations they could charge Perez with.[1] Eleven minutes after handcuffing Perez, Officer Fretheim spoke to Officer Baldwin again. Officer Baldwin stated that after she told Perez to go into the store or return to his vehicle, he went inside the convenience store,

---

[1] The events are all recorded on the dash camera videos of Officers Baldwin and Casas.

bought a bag of chips, returned to his vehicle and opened his trunk, and then stood at the gas pump, playing on his phone as the other officers arrived. Twelve minutes after Perez was handcuffed, Officer Baldwin stated, "if he's good and not intoxicated, then he can go." She stated the same thing again thirty seconds later. At twelve minutes and forty-one seconds after Perez was handcuffed, Officer Fretheim stated, "I'll talk to him a couple minutes more and see what he says."

After learning Officer Baldwin arrested Galbraith for driving while intoxicated, the officers began questioning Perez, while he was still handcuffed, about where he had been before coming to the convenience store. During his testimony, Officer Casas testified that Officer Fretheim "smelled alcohol" on Perez.[2] The officers asked Perez if he had been drinking alcohol. He told them he consumed two beers and they decided to conduct the standardized field sobriety tests. Perez told them he was a diabetic and had related foot issues, but they conducted the tests anyway and determined Perez failed. He was then arrested for driving while intoxicated. *See id.*

At the motion to suppress hearing, the trial court heard testimony from Officer Baldwin and Officer Casas. The dash camera videos were admitted into evidence. The trial court granted Perez's motion to suppress and entered findings of facts and conclusions of law. This State's appeal followed. *See* TEX. CODE CRIM. PROC. ANN. 44.01.

## II. MOTION TO SUPPRESS

By its sole issue, the State argues the trial court abused its discretion by granting Perez's motion to suppress.

---

[2] The video did not show that any officer remarked about smelling alcohol on Perez.

3

**A.	Standard of Review**

We review a trial judge's ruling on a motion to suppress under a bifurcated standard of review. *Weems v. State*, 493 S.W.3d 574, 577 (Tex. Crim. App. 2016). First, we afford almost total deference to a trial judge's determination of historical facts. *Id.* The trial court is the sole trier of fact and judge of the witnesses' credibility and the weight to be given to their testimony. *Id.* Second, we review a judge's application of the law to the facts de novo. *Id.* We will sustain the judge's ruling if the record reasonably supports that ruling and is correct on any theory of law applicable to the case. *Id.*

When the trial judge makes explicit findings of fact, we afford those findings almost total deference as long as the record supports them, regardless of whether the motion to suppress was granted or denied. *State v. Castleberry*, 332 S.W.3d 460, 465 (Tex. Crim. App. 2011). Therefore, the prevailing party is entitled to the "the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008). We afford the same amount of deference to the trial judge's rulings on mixed questions of law and fact, if those rulings turned on an evaluation of credibility and demeanor. *Castleberry*, 332 S.W.3d at 465.

**B.	Applicable Law**

Courts have determined that there are three distinct types of interactions between police and citizens: (1) consensual encounters, which require no objective justification; (2) investigatory detentions, which require reasonable suspicion; and (3) arrests, which require probable cause. *Id.* at 466. An encounter is no longer consensual when an officer,

4

through physical force or a showing of authority, has restrained a citizen's liberty. *Id*. When a seizure takes the form of a detention, Fourth Amendment scrutiny is necessary— it must be determined whether the detaining officer had reasonable suspicion that the citizen is, has been, or is about to be engaged in criminal activity. *Id*. The time, place, and surrounding circumstances must be taken into account, but the officer's conduct is the most important factor in determining whether a police-citizen interaction is a consensual encounter or a Fourth Amendment seizure. *Id*.

Under the Fourth Amendment, a warrantless detention of the person that amounts to less than a full-blown custodial arrest must be justified by reasonable suspicion. *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011). This standard is an objective one that disregards the actual subjective intent of the arresting officer and looks, instead, to whether there was an objectively justifiable basis for the detention. *Id*. It also looks at the totality of the circumstances; those circumstances may all seem innocent enough in isolation, but if they combine to reasonably suggest the imminence of criminal conduct, an investigative detention is justified. *Id*. "[T]he relevant inquiry is not whether particular conduct is innocent or criminal, but the degree of suspicion that attaches to particular non-criminal acts." *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997). Moreover, the detaining officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain; rather, "the cumulative information known to the cooperating officers at the time of the stop is to be considered in determining whether reasonable suspicion exists." *Derichsweiler*, 348 S.W.3d at 914 (quoting *Hoag v. State*, 728 S.W.2d 375, 380 (Tex. Crim. App. 1987)).

To support reasonable suspicion, there must be articulable facts showing "that some activity out of the ordinary has occurred, some suggestion to connect the detainee to the unusual activity, and *some indication that the unusual activity is related to crime.*" *Id.* (emphasis in original). Once the reason for the detention has been satisfied, the detention may not be used as a "fishing expedition for unrelated criminal activity." *Davis v. State*, 947 S.W.2d 240, 245 (Tex. Crim. App. 1997) (quoting *Ohio v. Robinette*, 519 U.S. 33, 41 (1996)). An investigative detention "must be strictly circumscribed by the exigencies which justify its initiation." *Terry v. Ohio*, 392 U.S. 1, 25–26 (1968). As noted in *Terry*, "the scope of the search must be limited because a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Id.* at 18.

## C.    Discussion

The trial court issued detailed findings of facts and conclusions of law, including the following:

### I.    FINDINGS OF FACT

8. As Officer Baldwin was asking Galbraith for her insurance, Baldwin addressed the defendant telling him that he needed to get back in his vehicle or go inside. (4:35 SAMANTHAB first file of State's Exhibit 1).

. . . .

12. Baldwin left Galbraith in Galbraith's car while she approached Officer Fretheim to explain what had occurred.

13. Baldwin explained to Fretheim that she thought the defendant was Galbraith's boyfriend and that after she instructed the defendant to go inside or stay in the car, the defendant went in and bought chips and then sat in his car.

6

. . . .

18. While Baldwin was conducting the field sobriety tests on Galbraith, Officer Fretheim and Officer Casas approached the defendant.

19. The defendant initially denied knowing Galbraith.

20. After the defendant advised Fretheim of a possible pending felony, Fretheim handcuffed and searched the defendant and placed him in his unit *before* he attempted to establish probable cause to arrest defendant for any offense he may have committed that night. (SETI-IF second file of State's Exhibit 1).

21. Fretheim explained to the defendant as Fretheim handcuffed him that he (Fretheim) was just going to investigate. Fretheim told the defendant that the defendant's dishonesty made Fretheim suspicious.

22. Fretheim told the defendant that he wanted to find out exactly who the defendant was.

23. Officer Fretheim ran a check on the defendant, which came back quickly and was negative.

24. Despite receiving a quick response that there were no pending charges or warrants for the defendant, Officers Fretheim and Casas continued to detain the defendant and kept him restrained in handcuffs.

25. Officer Fretheim and Officer Casas waited for Officer Baldwin to finish with Galbraith.

26. While Officer Fretheim and Officer Casas were waiting, the defendant remained handcuffed in the police unit. During this time, Officer Fretheim and Officer Casas discussed the fact that the defendant lied about Galbraith being his girlfriend. (SETHF second file of State's Exhibit 1).

27. Fretheim discussed possible charges against the defendant suggesting to Casas [that the defendant was] interfering with public duties.

28. Casas questioned Fretheim about those charges when he asked whether the defendant was bothering Baldwin and asked Fretheim what Baldwin said. Fretheim explained that Baldwin said that the defendant was not doing what she directed him to do.

29. Fretheim stated that was all he could articulate as to defendant's

7

actions. (6:37 of SETHF second file of State's Exhibit 1).

30. Fretheim said he wanted to see what Baldwin wanted to do regarding the defendant, and "how bad" the defendant was not listening to her (7:47 of SETHF second file of State's Exhibit 1 ).

31. At no time during this exchange between Officers Fretheim and Casas did either of them express any suggestion that the defendant displayed any sign of intoxication, even *after* having had close personal contact with the defendant.

32. Both officers then approached Baldwin as she was finishing up with Galbraith and placing her in the back of the unit. Baldwin returned to her conversation with Officer Fretheim. Fretheim asked Baldwin "how bad" defendant was not following the directions Baldwin had given him.

33. Baldwin told Fretheim that she knew defendant was following Galbraith. Baldwin explained that the defendant got out of the vehicle and was standing there like he was on the phone while Baldwin was trying to talk to Galbraith. Baldwin told the defendant to get back in his car or go inside and the defendant went inside and bought a bag of chips. Defendant came back out and went to the trunk as if he was going to place the chips in the trunk. Defendant stood by the car, then got in and then got out, then like he was going to get gas and that is when backup arrived.

. . . .

36. Fretheim told Baldwin that the defendant was "clean". (11:55 SETHF second file of State's Exhibit 1).

37. Baldwin stated: "*if he is good, he's not intoxicated, that's fine*". (ll :58 SETHF second file of State's Exhibit 1).

38. Baldwin explained that Galbraith finally admitted to drinking 3 drinks and Baldwin stated her opinion of where she believed Galbraith and the defendant were coming from.

39. Baldwin told Fretheim that if the defendant was good, he was good to go. (12:27 SETHF second file of State's Exhibit 1).

. . . .

41. At no time during his report back to Baldwin at the scene, did Fretheim indicate that the defendant displayed any sign of intoxication. In fact,

8

Fretheim told Baldwin that the defendant was "clean". The Court finds that while Officer Fretheim was waiting to speak to Officer Baldwin and was talking to Casas, he appeared to be looking for something to charge the defendant with, such as interfering with public duties. However, the record is devoid of any consensus or agreement between the officers of what, if any, offense defendant may have committed. Furthermore, Officer Fretheim never suggested to either of the other officers that the defendant displayed any sign of intoxication at the scene.

42. As he walked away from Baldwin and back towards the defendant, Fretheim told Baldwin that he would speak to the defendant a "couple" minutes more (12:37 of SETHF second file of State's Exhibit 1).

43. Defendant told Fretheim that he was at Izzie's for an hour. Fretheim asked defendant if he had anything to drink with [Galbraith]. (13:07 of SETHF second file of State's Exhibit 1). Defendant admitted to drinking 2 beers. The Court finds that this statement was made while the defendant was in custody and had been detained, in handcuffs, for over 12 minutes.

. . . .

45. Fretheim told the defendant that he was going to take the cuffs off. (14:42 of SETHF second file of State's Exhibit 1).

46. By this time, Defendant had been handcuffed for over 14 minutes.

. . . .

48. The officers' in court testimony during the motion to suppress hearing as to why the defendant was detained contradicted the video evidence provided by the State of Texas. Therefore, the Court relied on the video evidence instead of the in-court testimony.

## II. CONCLUSIONS OF LAW

1. The Court concludes that the defendant had not committed any traffic violation, or other criminal act to warrant defendant's detention.

2. At the hearing[,] defense counsel took the position that the defendant was illegally detained, without reasonable suspicion, when Officer Baldwin told him to either stay in the car or go inside the store, as Officer Baldwin admitted that she did not have a violation on the defendant. (27:15 SETHF second file of State's Exhibit 1). The Court finds that defendant was clearly detained when Officer Freitheim [sic] and Officer Casas handcuffed the

9

defendant and placed him in the police patrol car and further that such detention was without reasonable suspicion.

3. The Court concludes that the initial statement made by the defendant, denying that he knew Galbraith, was not material to the investigation of Galbraith as contemplated by Section 37.08 of the Texas Penal Code.

4. The Court concludes that Fretheim could not articulate any reason to detain the defendant beyond the point at which Frietheim [sic] confirmed the defendant's identity and was advised that the defendant had no outstanding warrants. (6:37 of SETHF second file of State's Exhibit 1).

5. As Officers Baldwin, Fretheim and Casas did not have reasonable suspicion to detain the defendant, the defendant's detention was illegal.

6. The Court concludes that, because Officers Baldwin, Fretheim and Casas did not have reasonable suspicion for the detention, the motion to suppress should be granted and the detention, arrest and any evidence obtained as a result should be suppressed.

7. The Court concludes that the defendant was illegally arrested when Officer Fretheim placed him in handcuffs and put him in the back of his unit for over 14 minutes without probable cause.

8. The Court concludes that, because Officers Baldwin, Fretheim and Casas did not have probable cause to arrest the defendant, the motion to suppress should be granted and the arrest and any evidence obtained as a result should be suppressed.

9. The Court finds that the State of Texas did not meet its burden of proof to justify a warrantless seizure of the defendant.

(Emphasis in original).

Here, we must give almost total deference to the trial court's findings of fact as long as the record supports them. *Castleberry*, 332 S.W.3d at 465. The trial court found that Perez was detained when he was handcuffed. Once his identity was confirmed and his criminal record came back as "clear," the reasonable suspicion first elicited by the officers ceased. *See Davis*, 947 S.W.2d at 243 (noting that, an "investigative detention

10

must be temporary and last no longer than is necessary to effectuate the purpose of the stop.") (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Without more, Perez should have been released from his handcuffs and detention at this point. The length of time after the officers learned Perez was clear of any outstanding criminal charges can be seen as akin to a "fishing expedition" in which the officers looked for some other offense to charge or hold him with. *Id.* (quoting *Robinette*, 519 U.S. at 41.). Even though Officer Casas testified that Officer Fretheim "smelled alcohol" on Perez to try to justify a need for a continued detention, that was not heard on the video as the officers spoke to one another. The trial court found that the officers' testimony in court contradicted the video evidence, and solely relied on the video evidence in making its decision. Because we give almost total deference to the trial court's factual findings, we hold that the officers did not have reasonable suspicion to continue detaining Perez after he was cleared. The trial court's granting of Perez's motion to suppress was proper. *See Castleberry*, 332 S.W.3d at 465. We overrule the State's sole issue.

### III. CONCLUSION

We affirm the trial court's ruling.

GINA M. BENAVIDES,
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed the
30th day of January, 2020.