

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-12-00562-CR

Arthur Todd **MACCUBBIN**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the County Court at Law No. 2, Bexar County, Texas
Trial Court No. 298509
Honorable Jason Wolff, Judge Presiding

Opinion by:    Sandee Bryan Marion, Justice

Sitting:    Catherine Stone, Chief Justice
    Sandee Bryan Marion, Justice
    Patricia O. Alvarez, Justice

Delivered and Filed:  September 11, 2013

AFFIRMED

A jury found appellant, Arthur Todd MacCubbin, guilty of driving while intoxicated.  The

trial court ordered him to pay an $800 fine and placed him on community supervision.  In his sole

issue on appeal, appellant contends the trial court erred in denying his motion to suppress because

he was denied his constitutional right to confront the witnesses against him whose statements were

used as the basis for the police officer's reasonable suspicion to stop his vehicle.  We affirm.

**ANALYSIS**

We review a trial court's ruling on a motion to suppress under an abuse of discretion standard and overturn the trial court's ruling only if it is outside the zone of reasonable disagreement. *Martinez v. State*, 348 S.W.3d 919, 922 (Tex. Crim. App. 2011). We apply a bifurcated standard of review, in which we give deference to a trial court's determination of historical facts and mixed questions of law and fact that rely upon the credibility of a witness, and apply a de novo standard of review to pure questions of law and mixed questions that do not depend on credibility. *Id*. at 922–23.

Appellant filed a motion to suppress, arguing there was no reasonable suspicion to stop the vehicle appellant was driving and there was no probable cause for his arrest.[1] At the hearing on reasonable suspicion, Officers Diaz, Knox, and Alaniz testified.

Officer Diaz testified he responded to a one-car accident near 1604 and Potranco Road on the night of appellant's arrest. The occupants of the vehicle, John and Desiree Ibarra, had been following an "unmarked"[2] police car when they wrecked their vehicle. The Ibarras were on the phone with 911 as they were following a police vehicle they thought was being driven by a group of males who were not police officers. Diaz stated the following about his conversation with Mr. Ibarra at the scene of the accident:

> A:      Well, Mr. Ibarra said that he was following a vehicle that he believed was not — or was a person impersonating a police officer. He was on the phone — on and off the phone with our dispatcher advising him — of them of it — of his location and the location of the vehicle that he believed was not a police officer.
> Q:      Okay. And so he — did he call 911?

---

[1] Two hearings were held on appellant's motion to suppress. The hearing that focused on reasonable suspicion took place pretrial, and the hearing on probable cause took place during trial and outside the presence of the jury. However, appellant's issue on appeal only concerns whether the police had reasonable suspicion to stop the vehicle. We accordingly focus our review on the pretrial hearing on reasonable suspicion.

[2] The police vehicle is referred to as "unmarked" throughout the hearing. However, Officer Knox testified that the vehicle is still technically "marked" with the word "constable" along the sides. He testified it is called an "unmarked" police vehicle because it is black and "["constable" is] not as visible as, you know, a normal police car."

A:    Yes, sir.
Q:    Okay.  Now, did he describe the vehicle?
A:    He just said that it was an unmarked police car with lights — emergency lights on and [sic] that turned at points, and he believed he wasn't a police officer. So he was just following it advising dispatch for a marked unit to go and investigate further.

While on the phone with the police dispatcher and following the unmarked police car that was the subject of the call, Mr. Ibarra lost control of his vehicle and crashed.  Diaz testified, "[d]uring the turnaround he lost control, that's when Mr. Ibarra lost control and the unmarked police car or the vehicle that he believed was an unmarked police car continued down going northbound on 1604."  Diaz testified that the Ibarras were not injured in the crash and Diaz advised the other officers in the area to continue searching for the suspect unmarked police vehicle.  Diaz testified there were other officers searching for the vehicle that night:

Q:    So were there other officers out looking for this vehicle?
A:    Yes, sir, there was.
Q:    Okay.
A:    There was [sic] several calls.  That's why there was more than one officer going out there.
Q:    Okay.
A:    There was [sic] several calls and locations of the car that we were looking for, the unmarked police car with emergency lights.

Diaz wrote a police report detailing the incident, which was admitted into evidence without objection.

Officer Knox testified that on the night of appellant's arrest sometime before the Ibarras' accident he responded to a 911 call made by Candis Harty.  The State introduced into evidence a 911 call "key card" that provided the officers with information and details about the call.  The "key card" was admitted without objection.  Knox stated he met Harty after she called 911 to report a group of males in an unmarked police car she had encountered at a Sonic restaurant off of 1604.  Knox stated:

Q:      Okay.  And what did Candis have to say.  Why — why did she call you out there?

A:      She said they were at the Sonic over there and a car pulled in and said they had constable written on the side and lights and sirens and there was a couple guys in there and they were screaming out the window and asked them for their ID.  And they thought it was weird because they weren't — so they didn't want to give it to them and these guys got more upset and irate and they just sped off with their lights on and ran a red light.  They thought that was weird, not ordinary so they called us to follow up on it.

Knox testified that Harty described the vehicle as "a Crown vehicle with constable written on the side and then lights and siren."  Knox stated that after meeting with Hardy he proceeded to search for the vehicle:

Q:      Okay.  And did — at what point — did you continue to look for this vehicle?

A:      For a while, yes.

Q:      Okay.  And why were you looking for this vehicle?

A:      Just to figure out what was going on with the vehicle, you know, why they were stopping and asking people, why they weren't in uniform.  They actually — if it wasn't a stolen vehicle, I mean, I didn't know if somebody stole a police officer's vehicle so —

Q:      Okay.  So is that something that would be important to find out?

A:      Absolutely.

Knox testified after leaving the Sonic he continued to look for the vehicle described by Harty.  While searching, he received a radio call to assist Officer Diaz with the accident involving the Ibarras.  Knox arrived and while on the scene of the accident, he saw a black Crown Victoria drive by with "constable" written along the side matching the description given by Harty:

A:      . . . while working that accident, I was on the access road at 1604 and Culebra and that same constable vehicle passed me into the turnaround.

Q:      Okay.  So did the vehicle that you see — you saw at that accident scene match the description that Ms. Harty had given you?

A:      Yes.

Q:      Okay.  And so what — what did you do next?

A:      Just got on the radio 'cause, you know, I was stuck at that accident and I couldn't follow the vehicle.  So I got on the radio with the other officer in the area to — to stop it.

Officer Alaniz also testified at the hearing.  Alaniz testified he had heard multiple calls over the radio about a dark police vehicle with the word "constable" on the side possibly being

driven by people who were not police officers and he had seen more than one "key card" about the incident on the night of appellant's arrest. He testified this information was broadcast over the police radio describing a "vehicle driving reckless up and down 1604, having — turning its — turning on and off hazard lights, turning on and off police lights as well." While responding to assist Officers Knox and Diaz with the Ibarras' accident, Alaniz received an additional call from Knox about the suspect vehicle:

> Q:      Okay. And did you at any point receive a radio call about the location of that vehicle?
> A:      I did. I was going to assist Officer Knox on the — on an accident at Culebra and 1604. I was driving northbound on the access road. And at that point I heard — I heard him come out on the radio stating that he had spotted the vehicle taking the turnaround to go back south on 1604.
> Q:      Okay. And did you — did you observe that vehicle?
> A:      When he keyed up on the radio and said he was at the turnaround, I was approaching the turnaround. And when I made the turnaround, I did see the vehicle and that's when I pulled him over into the shopping center.

Alaniz spotted the vehicle a few seconds after hearing Knox's call on the radio, and testified the vehicle matched the description of the unmarked police vehicle that was the subject of multiple calls that night. Alaniz pulled the unmarked police vehicle over and made contact with appellant, the driver. Alaniz testified, "I made contact with the driver. I noticed he was in plain clothes. I wanted to get him out of the vehicle because I didn't know who he was. Since he wasn't in uniform, I wanted to identify him. I pulled him out of the vehicle and I could smell the odor of intoxicants . . . ." Appellant was subsequently arrested for driving while intoxicated. A police report authored by Alaniz was also entered into evidence without objection. The trial court concluded there was reasonable suspicion to justify the stop of appellant's vehicle and denied appellant's motion to suppress; he now appeals the trial court's ruling.

On appeal, appellant asserts the trial court erred in denying his motion to suppress because his confrontation rights were violated when he did not have the opportunity to confront Ibarra and

Harty. The State argues the confrontation clause does not apply to pre-trial motion to suppress hearings. However, we need not decide this issue because an officer need not personally observe a traffic violation and a stop may be justified if the facts underlying the traffic stop are observed by a citizen-informant. *Brother v. State*, 166 S.W.3d 255, 257–59 (Tex. Crim. App. 2005).

"[I]nformation provided to police from a citizen-informant who identifies himself and may be held to account for the accuracy and veracity of his report may be regarded as reliable." *Derichsweiler v. State*, 348 S.W.3d 906, 914–15 (Tex. Crim. App. 2011). When the information is provided by an identified citizen-informant, "the only question is whether the information that the known citizen-informant provides, viewed through the prism of the detaining officer's particular level of knowledge and experience, objectively supports a reasonable suspicion to believe that criminal activity is afoot." *Id*. at 915 (internal citations omitted). Both the Ibarras and Harty provided identifying information about themselves in reporting the suspicious vehicle. The information obtained about the suspicious vehicle was broadcast over the police radio to alert officers in the area. Officer Alaniz testified he saw the "key cards" and heard multiple radio calls regarding an unmarked, black police vehicle with "constable" written on the side being driven up and down 1604 by a group men who were not in uniform the night of appellant's arrest. The vehicle Alaniz pulled over matched this description and was in the same area.

The trial court had before it evidence including the officers' testimony, the officers' police reports, and the 911 "key card" detailing the calls made regarding the vehicle driven by appellant that night. With all the evidence before it, the trial court's ruling was not "outside the zone of reasonable disagreement" in concluding there was reasonable suspicion to stop appellant's vehicle, and we therefore conclude it was not an abuse of discretion to deny appellant's motion to suppress. *See Martinez*, 348 S.W.3d at 922.

**CONCLUSION**

On the evidence before it, the trial court did not abuse its discretion in concluding reasonable suspicion existed and, thus, we conclude the trial court did not err in denying appellant's motion to suppress. The trial court's judgment is affirmed.


Sandee Bryan Marion, Justice

Do not publish