

# NUMBERS 13-18-00587-CR, 13-18-00593-CR, AND 13-18-00594-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

DONALD CHIMAOBI OKORO,                                                      Appellant,

v.

THE STATE OF TEXAS,                                                              Appellee.

### On appeal from the 369th District Court
### of Leon County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Hinojosa
Memorandum Opinion by Justice Hinojosa**

Following a guilty plea, appellant Donald Chimaobi Okoro appeals his convictions

for one count of possession of 400 grams or more of Alprazolam (Xanax), a first-degree

felony; one count of possession of 400 grams or more of an opioid identified as U-47700,

also a first-degree felony; and one count of possession of four grams or more but less

than 200 grams of methamphetamine, a second-degree felony. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.102, 481.104, 481.115, 481.117. By one issue, Okoro argues that the trial court erred in denying his motion to suppress evidence obtained from a traffic stop because law enforcement officers unconstitutionally detained him longer than necessary. We affirm.

## I.    BACKGROUND[1]

Okoro was indicted on three counts of possession of a controlled substance. *See id*. Okoro filed a pretrial motion to suppress evidence obtained following his traffic stop, alleging that his stop was unlawfully prolonged. The trial court held a hearing on Okoro's motion to suppress. Only one witness, Trooper Joel Smith of the Texas Department of Public Safety, testified.

Smith testified that on August 17, 2017, Okoro was driving a Toyota Avalon southbound on Interstate Highway 45 at eighty miles per hour, which was five miles per hour over the speed limit. Smith, a K-9 Officer, signaled his lights to pull the vehicle over. Smith noticed that, after Okoro pulled onto the improved shoulder, the vehicle slowly rolled more than twenty seconds before it came to a complete stop. The total time from the moment the lights were flashed until the vehicle stopped was forty-two seconds. This raised Smith's suspicion because in his experience as a seven-year trooper who makes approximately one to two thousand stops a year, a suspect taking a long time to stop for police after being pulled over can indicate criminal activity. He testified, for example, that

---

[1] This case is before this Court on transfer from the Tenth Court of Appeals in Waco pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001.

it can give someone the opportunity to hide a gun or drugs, or it can give two people opportunity to collaborate a story.

Smith stated that he approached the vehicle on the passenger side to talk to the driver, Okoro.[2] Smith noticed that the passenger, Bobbie Clarence Hampton, stayed on his phone. Smith asked Okoro some basic questions and got a "weird vibe from the passenger" based on his body language. According to Smith, Hampton gave him a blank stare, never said anything, and never got off his phone. Smith asked the men where they were going—one mentioned they were musicians "recording" in Dallas and the other mentioned a live performance. Smith noticed more than two cell phones in the car. Smith asked Okoro to get out of the car and accompany him to the trooper vehicle. He told Okoro that he would issue him a warning if he could verify insurance. As they were walking to the vehicle, Smith claimed that Okoro's "total demeanor change[d]" when he saw Smith's K-9 Maya in the back seat of his vehicle. The men entered the vehicle.

Smith verified that the vehicle was insured. He also checked Okoro's criminal history and learned that Okoro "was a convicted felon, he had some misdemeanors, and he had a current open felony in another county." At about this time, Smith texted his partner for backup.

Okoro asked to get out of the trooper vehicle. The trooper agreed but asked to frisk Okoro for weapons. Okoro agreed. Upon conducting this frisk, Smith found approximately $1,000 in cash and another cell phone. Smith maintained a conversation with Okoro as they walked back to Okoro's car, asking about his shoes and music. He learned that the

---

[2] The trooper explained that approaching on the passenger side is safer, as the vehicles were pulled over on a busy interstate highway.

passenger, Hampton, rented the vehicle and that the men were on their way from Houston to Dallas, which Smith declared were "two major drug hubs." Smith also said that, in his experience, criminals often rented vehicles to avoid having their personal vehicles become impounded in the event of an arrest.

Smith asked for consent to search Okoro's vehicle. Okoro refused. The trooper said that the long amount of time it took Okoro to stop the vehicle, the passenger's body language, the multiple cell phones, Okoro's reaction to the dog, Okoro's prior criminal history, and the conflicting stories were some articulable facts that raised his suspicion that there was criminal activity afoot. When Smith's partner, Trooper Mike Asby, arrived approximately fourteen minutes after Okoro was first pulled over, Smith conducted an open-air sniff test with his K-9 Maya. Smith testified that he waited to conduct this test until his partner arrived for officer safety reasons. Maya alerted the troopers to possible contraband. Upon searching the vehicle, the officers found fifty-four pounds of Xanax bars, thirteen pounds of counterfeit hydrocodone, forty-five grams of counterfeit oxycodone, and five grams of methamphetamine.

In the hearing on the motion to suppress, Okoro explained that he became startled in the car because he did not expect to see a dog. He also argued that after Smith had verified insurance, the trooper should have allowed the men to leave. He claimed that Smith's fourteen-minute detention violated Fourth Amendment principles against unlawful searches and seizures. Okoro asserted that Smith "prolonged the detention of Mr. Okoro for a substantial and unreasonable amount of time with no specific, articulable facts demonstrating a reasonable suspicion of any illegal activity, based only on inchoate

4

feelings and hunches." The trial court denied Okoro's motion to suppress and issued the following findings of fact in support of its decision:

3. During Trooper Smith's investigation into the traffic violation, he developed reasonable suspicion that the Defendants may be involved in other criminal activity. Okoro took approximately 42 seconds to come to a complete stop. He also testified that Defendants gave conflicting stories about the purpose of the trip and where the Defendants would be staying once they arrived in Dallas. The car was a third-party rental, which trooper Smith stated is common for drug traffickers. Trooper Smith testified that he noticed multiple cell phones in the car, including a burner phone. Defendants had criminal histories involving illegal drugs.

4. Trooper Smith requested additional officers to the scene for officer safety due to his reasonable suspicion that the defendants were involved in further criminal activity and the physical size of defendants compared to the size of Trooper Smith.

5. Trooper Smith waited for backup before asking the defendant for consent to search the vehicle. When the Defendant denied consent to search the car, trooper Smith informed the Defendant that he would have his K-9 perform an open-air sniff of the vehicle.

6. The delay from the time Trooper Smith gathered all the necessary information to conclude the traffic violation and the time when Trooper Smith was able to perform the open[-]air sniff was approximately 14 minutes.

7. During the open[-]air sniff around the vehicle, the K-9 alerted to the presence of contraband. The officers searched the vehicle and controlled substances were found.

In addition, the court also made the following conclusions of law with respect to its decision to deny the motion to suppress:

The Court finds that on August 17, 2017, the Defendants were detained by the Texas Department of Public Safety beyond the investigation into the traffic stop. However, if an officer develops reasonable suspicion, the detention does not violate the United States and Texas Constitutions.

5

An open[-]air search by a drug detecting dog is not considered a search. According to his testimony, Trooper Smith did not utilize his K-9 earlier because he was waiting for backup for officer safety.

Considering all of the factors, the Court denies the Motion to Suppress, finding the totality of the circumstances establish objective reasonable suspicion for the 14[-]minute detention.

Okoro pleaded guilty to one count of possession of 400 grams or more of Alprazolam (Xanax), one count of possession of 400 grams or more of an opioid identified as U-47700, and one count of possession of four grams or more but less than 200 grams of methamphetamine.[3] *See id.* §§ 481.115, 481.117. Pursuant to a plea agreement, the trial court sentenced him to thirty years for the first-degree felonies of possession of Alprazolam and U-47700, and twenty years for the second-degree felony of methamphetamine possession, to be served concurrently. The trial court also certified Okoro's right to appeal the motion to suppress ruling. *See* TEX. CODE CRIM. PROC. ANN. art. 44.02. Okoro appeals.

## II. STANDARD OF REVIEW & APPLICABLE LAW

### A. Standard of Review

We review a trial judge's ruling on a motion to suppress under a bifurcated standard of review. *Weems v. State*, 493 S.W.3d 574, 577 (Tex. Crim. App. 2016). First, we afford almost total deference to a trial judge's determination of historical facts. *Id.* The trial court is the sole trier of fact and judge of the witnesses' credibility and the weight to

---

[3] The parties agreed to consolidate all three charges into one case for the purposes of appeal. Trial court cause number 17-0203CR is appellate cause number 13-18-00587-CR; trial court cause number 17-0204CR is appellate cause number 13-18-00593-CR; and trial court cause number 17-0205CR is appellate cause number 13-18-00594-CR.

be given to their testimony. *Id.* Second, we review a judge's application of the law to the facts de novo. *Id.* We will sustain the judge's ruling if the record reasonably supports that ruling and is correct on any theory of law applicable to the case. *Id.*

When the trial judge makes explicit findings of fact, as she did here, we afford those findings almost total deference so long as the record supports them, regardless of whether the motion to suppress was granted or denied. *State v. Castleberry*, 332 S.W.3d 460, 465 (Tex. Crim. App. 2011). Therefore, the prevailing party is entitled to the "the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008). We afford the same amount of deference to the trial judge's rulings on mixed questions of law and fact, if those rulings turned on an evaluation of credibility and demeanor. *Castleberry*, 332 S.W.3d at 465.

## B. Applicable Law

Courts have determined that there are three distinct types of interactions between police and citizens: (1) consensual encounters, which require no objective justification; (2) investigatory detentions, which require reasonable suspicion; and (3) arrests, which require probable cause. *Id.* at 466. An encounter is no longer consensual when an officer, through physical force or a showing of authority, has restrained a citizen's liberty. *Id.*

Under the Fourth Amendment, a warrantless detention of the person that amounts to less than a full-blown custodial arrest must be justified by reasonable suspicion. *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011). This standard is an objective one that disregards the actual subjective intent of the arresting

7

officer and looks, instead, to whether there was an objectively justifiable basis for the detention. *Id.* It also looks at the totality of the circumstances. *Id.* Circumstances may seem innocent enough in isolation, but an investigative detention may be justified if the combination of factors suggests the imminence of criminal conduct. *Id.* "[T]he relevant inquiry is not whether particular conduct is innocent or criminal, but the degree of suspicion that attaches to particular non-criminal acts." *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997). Moreover, the detaining officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain; rather, "the cumulative information known to the cooperating officers at the time of the stop is to be considered in determining whether reasonable suspicion exists." *Derichsweiler*, 348 S.W.3d at 914 (quoting *Hoag v. State*, 728 S.W.2d 375, 380 (Tex. Crim. App. 1987)).

During a traffic stop, once the computer check is completed, and the officer knows that the driver has a current valid license, no outstanding warrants, and the car is not stolen, the traffic stop investigation is fully resolved. *Lerma v. State*, 543 S.W.3d 184, 191 (Tex. Crim. App. 2018). "However, if an officer develops reasonable suspicion that the driver or an occupant of the vehicle is involved in criminal activity, the officer may continue questioning the individual regardless of whether the official tasks of a traffic stop have come to an end." *Id.*; *see Ramirez-Tamayo v. State*, 537 S.W.3d 29, 39 (Tex. Crim. App. 2017).

### III.    ANALYSIS

Here, we must give almost total deference to the trial court's findings of fact if the record supports them. *See Castleberry*, 332 S.W.3d at 465. The trial court heard evidence

8

that: (1) Okoro took approximately forty-two seconds to come to a complete stop; (2) Okoro and his passenger gave conflicting stories about the purpose of the trip; (3) the car Okoro drove was a rental, which Trooper Smith explained was common among criminals in the drug trade; (4) there were multiple cell phones in the car, including a burner phone; and (5) Okoro had a criminal history involving illegal drugs. There was also testimony that Okoro appeared nervous at the sight of the drug-sniffing K-9 dog Maya.

Although the stop may have been longer than usual, the court recognized that "Trooper Smith requested additional officers to the scene for officer safety due to his reasonable suspicion that the defendants were involved in further criminal activity and the physical size of defendants compared to the size of Trooper Smith." Under our review, the State is entitled to the "the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *Garcia-Cantu*, 253 S.W.3d at 241. In light of the foregoing facts, we conclude that the cumulative information known to Trooper Smith indicated that reasonable suspicion existed which justified prolonging the detention for further investigation. *See Lerma*, 543 S.W.3d at 191; *Derichsweiler*, 348 S.W.3d at 914. Based on the totality of circumstances, Trooper Smith had reasonable suspicion that Okoro was involved in criminal activity, allowing him to continue his stop past the initial traffic stop investigation. *See Lerma*, 543 S.W.3d at 191; *Ramirez-Tamayo v. State*, 537 S.W.3d at 39.

We overrule Okoro's sole issue.

### IV. CONCLUSION

We affirm the trial court's judgment.

LETICIA HINOJOSA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
23rd day of April, 2020.